## FINNEGAN ET AL. *v.* LEU ET AL.

No. 80–2150.   Argued February 24, 1982—Decided May 17, 1982

BURGER, C. J., delivered the opinion for a unanimous Court. BLACK-MUN, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 442.

*Samuel G. Bolotin* argued the cause and filed a brief for petitioners.

*Ted Iorio* argued the cause for respondents. With him on the brief was *Jack Gallon* and *Jeffrey Julius*.\*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented in this case is whether the discharge of a union's appointed business agents by the union president, following his election over the candidate supported by the business agents, violated the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U. S. C.

---

\**Alan Hyde* and *Paul Alan Levy* filed a brief for the Association for Union Democracy et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll, Marsha Berzon,* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations; and by *Amy Gladstein* and *James Reif* for the National Labor Law Center of the National Lawyers Guild.

§ 401 *et seq.* The Court of Appeals held that the Act did not protect the business agents from discharge. We granted certiorari to resolve Circuit conflicts,[1] 454 U. S. 813 (1981), and we affirm.

I

In December 1977, respondent Harold Leu defeated Omar Brown in an election for the presidency of Local 20 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a labor organization representing workers in a 14-county area of northwestern Ohio.[2] During the vigorously contested campaign, petitioners, then business agents of Local 20, openly supported the incumbent president, Brown. Upon assuming office in January 1978, Leu discharged petitioners and the Local's other business agents, all of whom had been appointed by Brown

---

[1] See, *e. g., Lamb* v. *Miller,* 212 U. S. App. D. C. 393, 660 F. 2d 792 (1981); *Maceira* v. *Pagan,* 649 F. 2d 8 (CA1 1981); *Newman* v. *Local 1101, Communications Workers,* 570 F. 2d 439 (CA2 1978); *Bradford* v. *Textile Workers Local 1093,* 563 F. 2d 1138 (CA4 1977); *Gabauer* v. *Woodcock,* 520 F. 2d 1084 (CA8 1975), cert. denied, 423 U. S. 1061 (1976); *Wambles* v. *International Brotherhood of Teamsters,* 488 F. 2d 888 (CA5 1974); *Wood* v. *Dennis,* 489 F. 2d 849 (CA7 1973) (en banc), cert. denied, 415 U. S. 960 (1974); *Grand Lodge of International Assn. of Machinists* v. *King,* 335 F. 2d 340 (CA9), cert. denied, 379 U. S. 920 (1964); *Sheridan* v. *Carpenters Local No. 626,* 306 F. 2d 152 (CA3 1962).

[2] Brown challenged the election results and, following an investigation, the Secretary of Labor determined that unlawful employer contributions had affected the outcome of the election. The Secretary filed suit in the United States District Court for the Northern District of Ohio, and that court ordered a rerun election under the Secretary's supervision; the Court of Appeals for the Sixth Circuit affirmed. *Marshall* v. *Local 20, Teamsters,* 611 F. 2d 645 (1979). In the second election, Leu again defeated Brown.

Brown and Leu had previously opposed each other in the 1974 election for the presidency. Although Leu defeated Brown by a slight margin, the election was set aside by the International Union because of irregularities at the polling places. Brown won the second election, which was held in 1975 under the supervision of a panel from the International Union.

following his election in 1975.[3] Leu explained that he felt the agents were loyal to Brown, not to him, and therefore would be unable to follow and implement his policies and programs.

Local 20's bylaws—which were adopted by, and may be amended by, a vote of the union membership—provide that the president shall have authority to appoint, direct, and discharge the Union's business agents. Bylaws of Teamsters, Chauffeurs, Warehousemen and Helpers Union Local No. 20, Art. IX, § 3 D, Joint Exhibit 1, p. 15 (1975). The duties of the business agents include participation in the negotiating of collective-bargaining agreements, organizing of union members, and processing of grievances. In addition, the business agents, along with the president, other elected officers, and shop stewards, sit as members of the Stewards Council, the legislative assembly of the Union. Petitioners had come up through the union ranks, and as business agents they were also members of Local 20. Discharge from their positions as business agents did not render petitioners ineligible to continue their union membership.

Petitioners filed suit in the United States District Court, alleging that they had been terminated from their appointed positions in violation of the Labor-Management Reporting and Disclosure Act, 29 U. S. C. §§ 411(a)(1), 411(a)(2), 412, and 529. The District Court granted summary judgment for respondents Leu and Local 20, holding that the Act does not protect a union employee from discharge by the president of the union if the employee's rights as a union member are not affected. *Navarro* v. *Leu,* 469 F. Supp. 832 (1979). The United States Court of Appeals for the Sixth Circuit affirmed, concluding "that a union president should be able to work with those who will cooperate with his program and carry out his directives, and that these business agents, who

---

[3] When Brown was elected president in 1975, see n. 2, *supra,* the incumbent business agents resigned.

served at the pleasure of the union president, and actively supported the president's opponent could be removed from their employment as union business agents." App. to Pet. for Cert. A3.

## II

The Labor-Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership. The relevant provisions of the Act had a history tracing back more than two decades in the evolution of the statutes relating to labor unions. Tensions between union leaders and the rank-and-file members and allegations of union wrongdoing led to extended congressional inquiry. As originally introduced, the legislation focused on disclosure requirements and the regulation of union trusteeships and elections. However, various amendments were adopted, all aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution; not surprisingly, these amendments—ultimately enacted as Title I of the Act, 29 U. S. C. §§ 411–415—were introduced under the title of "Bill of Rights of Members of Labor Organizations."[4] The amendments placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in

---

[4] The original "Bill of Rights" amendment was introduced on the floor of the Senate by Senator McClellan and adopted by a vote of 47–46. 105 Cong. Rec. 6469–6493 (1959), 2 National Labor Relations Board, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 1096–1119 (1959) (hereafter Leg. Hist.). However, a compromise version of the amendment introduced by Senator Kuchel was substituted shortly thereafter, 105 Cong. Rec. 6716–6727 (1959), 2 Leg. Hist. 1229–1239, and later approved by the House of Representatives as part of the Landrum-Griffin bill, H. R. 8400, 86th Cong., 1st Sess. (1959), 1 Leg. Hist. 628–633. See 105 Cong. Rec. 15711, 15859–15860, 1692–1702 (1959), 2 Leg. Hist. 1645, 1691–1692, 1693–1702.

turn loss of livelihood. Such protection was necessary to further the Act's primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships. See 105 Cong. Rec. 6471–6472, 6476, 15530 (1959), 2 Leg. Hist. 1098–1099, 1103, 1566.

Sections 101(a)(1) and (2) of the Act, 29 U. S. C. §§ 411(a) (1) and (2), on which petitioners rely, guarantee equal voting rights, and rights of speech and assembly, to "[e]very *member* of·a labor organization" (emphasis added).[5] In addition, § 609 of the Act, 29 U. S. C. § 529, renders it unlawful for a union or its representatives "to fine, suspend, expel, or otherwise discipline any of its *members* for exercising any right to which he is entitled under the provisions of this Act." (Emphasis added.)[6] It is readily apparent, both from the

---

[5] Section 101(a)(1) provides:

"Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

Section 101(a)(2) provides:

"Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

[6] Section 609 provides:

"It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its

language of these provisions and from the legislative history of Title I, that it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect.[7]

Petitioners held a dual status as both employees and members of the Union. As *members* of Local 20, petitioners undoubtedly had a protected right to campaign for Brown and support his candidacy. At issue here is whether they were thereby immunized from discharge at the pleasure of the president from their positions as appointed union *employees*.

### III

Petitioners contend that discharge from a position as a union employee constitutes "discipline" within the meaning of § 609; and that termination of union employment is therefore unlawful when predicated upon an employee's exercise of rights guaranteed to members under the Act. However, we conclude that the term "discipline," as used in § 609, refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union. Section 609 speaks in terms of disciplining "members"; and the three disciplinary sanctions specifically enumerated—fine, suspension, and expulsion—are all punitive actions taken against union mem-

---

members for exercising any right to which he is entitled under the provisions of this Act. The provisions of section 102 shall be applicable in the enforcement of this section."

[7] The provisions of Title I consistently refer to the rights of union "members." As originally passed by the Senate, § 101(a)(4)—which in its present form protects the right of "any member" to institute legal proceedings against the union, 29 U. S. C. § 411(a)(4)—applied to "any member *or officer*" of a labor organization (emphasis added). S. 1555, 86th Cong., 1st Sess., § 101(a)(4) (1959), 1 Leg. Hist. 520. However, the words "or officer" were deleted from the Landrum-Griffin bill, H. R. 8400, 86th Cong., 1st Sess., § 101(a)(4) (1959), 1 Leg. Hist. 630–631, and the House version was retained in Conference, see H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 31 (1959), 1 Leg. Hist. 935. See also *Sheridan* v. *Carpenters Local No. 626*, 306 F. 2d, at 156–157.

bers as members.[8]  In contrast, discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees.  See *Sheridan* v. *Carpenters Local No. 626*, 306 F. 2d 152, 156 (CA3 1962). We discern nothing in § 609, or its legislative history, to support petitioners' claim that Congress intended to establish a system of job security or tenure for appointed union employees.

Congress used essentially the same language elsewhere in the Act with the specific intent not to protect a member's status as a union employee or officer.  Section 101(a)(5), 29 U. S. C. § 411(a)(5), states that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined" without enumerated prrcedural protections. The Conference Report accompanying S. 1555 as finally enacted, H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 31 (1959), 1 Leg. Hist. 935, explains that this "prohibition on suspension without observing certain safeguards applies only to suspension of membership in the union; *it does not refer to suspension of a member's status as an officer of the union*" (emphasis added).  This too is a persuasive indication that the virtually identical language in § 609 was likewise meant to refer only to punitive actions diminishing membership rights, and not to termination of a member's status as an appointed union employee.[9]

---

[8] Compare § 201(a)(5)(H) of the Act, 29 U. S. C. § 431(a)(5)(H), which requires reporting on the procedures for "discipline *or removal* of *officers or agents* for breaches of their trust" (emphasis added).

[9] In *Grand Lodge of International Assn. of Machinists* v. *King*, 335 F. 2d, at 344, the court held that Congress had used the "identical words . . . with quite different meanings" in the two sections.  The court found that the "legislative gloss" on the words "otherwise disciplined" in § 101(a)(5) stemmed primarily from congressional concern that "wrongdoing union officials"—and particularly those guilty of misappropriating union funds— might be permitted "to remain in control while the time-consuming 'due process' requirements of the section were met."  *Id.*, at 341–342.  See 105

We hold, therefore, that removal from appointive union employment is not within the scope of those union sanctions explicitly prohibited by § 609.

## IV

Our analysis is complicated, however, by the fact that § 102, 29 U. S. C. § 412, provides independent authority for a suit against a union based on an alleged violation of Title I of the Act. Section 102 states that

"[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

Although the intended relationship between §§ 102 and 609 is not entirely clear, it seems evident that a litigant may maintain an action under § 102—to redress an "infringement" of "rights secured" under Title I—without necessarily stating a violation of § 609.[10]

---

Cong. Rec. 17899 (1959) (remarks of Sen. Kennedy). However, viewing this concern as inapplicable with regard to § 609, the court concluded that "although Congress did not intend the words 'otherwise discipline' to include removal from union office in section 101(a)(5), it did intend the words to include such action in section 609." 335 F. 2d, at 345. See also *Maceira* v. *Pagan*, 649 F. 2d, at 14; *Wood* v. *Dennis*, 489 F. 2d, at 853–854.

We agree that the purposes of the two sections are different, and that the distinction drawn in *King* is one Congress plausibly could have chosen to make. However, we are hard pressed to discern any such distinction from either the language or legislative history of the Act. Certainly one would expect that if Congress had intended identical language to have substantially different meanings in different sections of the same enactment it would have manifested its intention in some concrete fashion. See *Wood* v. *Dennis, supra,* at 858 (Stevens, J., concurring in result).

[10] Section 609, of course, applies to disciplinary action taken in retaliation for the exercise of *any* right secured under the Act, whereas § 102 protects only rights secured by Title I. Although the two sections may be somewhat duplicative as regards union discipline imposed in retaliation for the exercise of Title I rights, this seems due in large part to the fact that the

The question still remains, however, whether petitioners' "rights secured" under Title I were "infringed" by the termination of their union employment. Petitioners, as union members, had a right under §§ 101(a)(1) and (2) to campaign for Brown and to vote in the union election, but they were not prevented from exercising those rights. Rather, petitioners allege only an *indirect* interference with their membership rights, maintaining that they were forced to "choos[e] between their rights of free expression . . . and their jobs." See *Retail Clerks Union Local 648* v. *Retail Clerks International Assn.*, 299 F. Supp. 1012, 1021 (DC 1969).

We need not decide whether the retaliatory discharge of a union member from union office—even though not "discipline" prohibited under § 609—might ever give rise to a cause

---

provisions derived from different sources and were originally intended to serve quite different purposes. Section 102 was first included as part of the so-called Kuchel Amendment, see n. 4, *supra*, and was designed to enforce the provisions of Title I by creating an individual right of action for union members. 105 Cong. Rec. 6719 (1959), 2 Leg. Hist. 1232. In contrast, the precursor of § 609 created *criminal* penalties for retaliatory discipline, and was included in the Senate bill prior to the addition of the bill of rights, see S. 1555, 86th Cong., 1st Sess., § 506 (1959) (as reported), 2 Leg. Hist. 390; it apparently was thought to be primarily applicable to violations of the election provisions. See 105 Cong. Rec. 6534 (1959), 2 Leg. Hist. 1140; Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn. L. Rev. 199, 218 (1960). The Landrum-Griffin bill retained this provision, but "temper[ed] the remedy," 105 Cong. Rec. 15531 (1959), 2 Leg. Hist. 1567 (remarks of Rep. Griffin), providing for civil enforcement by the Secretary of Labor instead of criminal sanctions. H. R. 8400, 86th Cong., 1st Sess., § 609 (1959), 1 Leg. Hist. 676. Finally, one day before passage of the Landrum-Griffin bill, § 609 was amended to authorize private suits by making "[t]he provisions of section 102 . . . applicable in the enforcement of this section." The amendment was promoted by Congressmen who thought that enforcement by the Secretary would lead to "unnecessary injection of the executive branch on the Federal level into law enforcement matters," 105 Cong. Rec. 15830 (1959), 2 Leg. Hist. 1662 (remarks of Rep. Cramer). See Rothman, *supra*, at 219.

of action under § 102. For whatever limits Title I places on a union's authority to utilize dismissal from union office as "part of a purposeful and deliberate attempt . . . to suppress dissent within the union," cf. *Schonfeld* v. *Penza*, 477 F. 2d 899, 904 (CA2 1973), it does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own.[11] Indeed, neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage.[12] To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections. See *Wirtz* v. *Hotel Employees*, 391 U. S. 492, 497 (1968). Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election.

Here, the presidential election was a vigorous exercise of the democratic processes Congress sought to protect. Petitioners—appointed by the defeated candidate—campaigned openly against respondent Leu, who was elected by a substantial margin. The Union's bylaws, adopted, and subject to amendment, by a vote of the union membership, grant the president plenary authority to appoint, suspend, discharge, and direct the Union's business agents, who have sig-

---

[11] We leave open the question whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees.

[12] We think it virtually inconceivable that Congress would have prohibited the longstanding practice of union patronage without any discussion in the legislative history of the Act. See *Wood* v. *Dennis*, 489 F. 2d, at 858 (Stevens, J., concurring in result). Had such a result been contemplated, it undoubtedly would have encountered substantial resistance. Moreover, Congress likely would have made some express accommodation to the needs of union employers to appoint and remove policymaking officials. See *ibid.*

nificant responsibility for the day-to-day conduct of union affairs. Nothing in the Act evinces a congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies.

No doubt this poses a dilemma for some union employees; if they refuse to campaign for the incumbent they risk his displeasure, and by supporting him risk the displeasure of his successor. However, in enacting Title I of the Act, Congress simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff. Rather, its concerns were with promoting union democracy, and protecting the rights of union *members* from arbitrary action by the union or its officers.

We therefore conclude that petitioners have failed to establish a violation of the Act. Accordingly, the decision of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring.

I am not prepared to hold that a newly elected president of a local union may discipline, without violating the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U. S. C. § 401 *et seq.*, and as a matter of retaliation, *all* union member-employees who opposed his candidacy. As the Court notes, a union member possesses, under the Act, rights to freedom of expression and of speech and assembly, *ante*, at 436–437, and a right to support the candidate of his choice.

I must assume that what the Court holds today is that the newly elected president may discharge the union's appointed business agents and other appointed union member-employees who will be instrumental in evolving the president's ad-

ministrative policies. See *Elrod* v. *Burns,* 427 U. S. 347 (1976); *Branti* v. *Finkel,* 445 U. S. 507 (1980). Indeed, the Court uses the terms "staff," *ante,* at 441, and "his own administrators," *ibid.* In addition, this particular union's bylaws expressly give the president plenary authority over the business agents. With that much, I have no difficulty.

On the understanding, but only on the understanding, that the Court by its opinion is not reaching out further to decide the same issue with respect to nonpolicymaking employees, that is, rank-and-file member-employees (a matter which, for me, presents another case for another day), I join the Court's opinion.