710 F.2d 234
 113 L.R.R.M. (BNA) 3220, 97 Lab.Cas. P 10,218
 Emil CEHAICH, Plaintiff-Appellant,
v.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE and
AGRICULTURAL IMPLEMENT WORKERS of AMERICA, a labor
organization; Douglas Fraser, Irving Bluestone, John Bolin,
and Robert Walker, jointly and severally, Defendants-Appellees.
 No. 81-1134.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 17, 1983.
Decided June 16, 1983.
 
 Barbara Shaw Harvey (argued), Wayne State University Law School, Detroit, Mich., for plaintiff-appellant.
 Bruce A. Miller, Renate Klass, Alan V. Reuther, John A. Fillion, M. Jay Whitman, Claude D. Montgomery (argued), Intern. Union, UAW, Detroit, Mich., for defendants-appellees.
 Before KEITH, MERRITT and JONES, Circuit Judges.
 KEITH, Circuit Judge.
 
 
 1
 The sole issue presented for review on this appeal is whether the district court erred in granting summary judgment to the defendant union under applicable federal labor law. For the reasons set forth below, we affirm.
 
 I.
 
 2
 Plaintiff-appellant, Emil Cehaich, has been employed by the General Motors Corporation since 1968. He is employed in the company's Design Staff Unit as a machine repair machinist in Detroit, Michigan. During his employment, Cehaich has also been a member in good standing of the International Union, United Automobile, Aerospace and Agricultural Workers of America (union).
 
 
 3
 In November of 1975, Cehaich was appointed to a position as benefits representative for the local General Motors Design Staff Unit. He was appointed to the position by Robert Walker, administrator of the Benefits Plans Section of the General Motors Department. Walker was appointed to his position by Irving Bluestone, an elected union official. As the administrator of the Benefits Plans Section, Walker was "directly responsible for appointing and supervising the activities of the benefits representatives in General Motors plants."
 
 
 4
 The benefits representative position is described in the collective bargaining agreement between the company and the union.[1] The benefits representative is responsible for generally conferring with, counseling, and assisting retirees, beneficiaries and surviving spouses regarding benefit problems under the pension, insurance and subagreements. The representative also handles the appeals of various claimants when benefits are initially denied and attends informational meetings about contractual benefits when necessary. This is an unpaid position, but benefits representatives are allowed to perform their duties during the normal work day.
 
 
 5
 In September 1979, the national union leadership negotiated a new collective bargaining agreement with General Motors. A special informational and educational meeting was called in Dallas, Texas for September 21-22, 1979. The purpose of this meeting was to inform influential local union members about the tentative agreement which was about to be offered to the general union membership. Elected and appointed union officers representing General Motors employees from all over the country were invited to attend. As an appointed union officer, Cehaich was one of those invited to the Dallas meeting.
 
 
 6
 At the meeting, Cehaich became part of a dissident caucus which opposed the tentative agreement. He was among those dissidents who distributed a leaflet criticizing the agreement and the national union leadership.[2] Defendants Walker and Bolin, assistant director of the union's General Motors Department, observed Cehaich distributing the leaflets. Walker allegedly told Cehaich he was "through."
 
 
 7
 When Walker returned to Detroit, he told GM to remove Cehaich's name as benefits representative. Upon learning of his removal, Cehaich was told that he had been removed from his position for "passing out slanderous literature." Walker refused to put this explanation in writing; however, there appears to be no dispute that Cehaich's actions in Dallas led to his discharge from union office. Cehaich has retained his job and does not allege that he has lost any privilege or incident of union membership.
 
 
 8
 On March 17, 1980, Cehaich filed the present action in the United States District Court for the Eastern District of Michigan. The complaint stated four causes of action. The first cause of action alleged that defendant Walker's actions constituted discipline and was a restraint on the free exercise of speech within the meaning of sections 101(a)(2) and 609 of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Secs. 411(a)(2)[3] and 529.[4] The second cause of action alleged that defendant Walker's summary removal of Cehaich violated section 101(a)(5) of the LMRDA, 29 U.S.C. Sec. 411(a)(5).[5] The third cause of action maintained that defendant Walker's actions constituted coercion and intimidation in violation of paragraph 7 of the union's collective bargaining agreement. The fourth cause of action alleged that defendant Walker's actions were a violation of Article 31 of the union's constitution. The defendants, relying upon Cehaich's statement of the facts, filed a motion for summary judgment on the first, second, and fourth causes of action.
 
 
 9
 On September 15, 1980, the district court filed a memorandum opinion and order granting the defendants' motion for partial summary judgment, 496 F.Supp. 912. The court held that section 101(a)(2) and section 101(a)(5) were not applicable to the facts of this case. The court held further that it had no jurisdiction to entertain suits involving an interpretation of the UAW constitution. On November 17, 1980, the district court denied Cehaich's motions for an expedited appeal pursuant to Fed.R.Civ.P. 54(b) and certification of the action under 28 U.S.C. Sec. 1292(b). Subsequent to the court's ruling on these issues, Cehaich dismissed his remaining cause of action with prejudice. He then perfected this appeal, challenging the district court's interpretation of sections 101(a)(2) and (a)(5) of the LMRDA.
 
 II.
 
 10
 The Supreme Court has recently considered the scope of protected activity within the meaning of the Labor Management Reporting and Disclosure Act. In Finnegan v. Leu, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Court discussed the protections of sections 101(a)(2), 101(a)(5) and 609. An examination of the authority set forth in that case will be helpful to a resolution of the issues before this court.
 
 A.
 
 11
 Finnegan v. Leu involved the dismissal of several business agents of a union local. The agents had supported the union president's political adversary during a recent campaign. Upon his election, the union president discharged the agents from their appointed positions. The agents were also members of the union. However, their discharge from their positions did not affect their status as union members.
 
 
 12
 The agents brought suit in federal district court alleging violations of sections 101(a)(2), 101(a)(5) and 609 of the Act. The defendants filed motions for summary judgment which were granted by the district court. See 469 F.Supp. 832. This court affirmed in an unpublished opinion. 652 F.2d 58 (6th Cir.1981). The Supreme Court granted a writ of certiorari to settle a conflict within the circuits on the interpretation of the Act. Finnegan, 456 U.S. at 433, 102 S.Ct. at 1869.[6]
 
 
 13
 Writing for the Court, Chief Justice Burger noted that the intent of the LMRDA was to insure that unions were run by democratic processes. It "places emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood." Id. at 435-436, 102 S.Ct. at 1870-1871. However, the Court noted that the business agents held a "dual status as both employees and members of the Union." Id. at 437, 102 S.Ct. at 1871. It was their status as union members that the Act sought to protect.
 
 
 14
 The court, therefore, concluded that "removal from appointive union employment is not within the scope of those union sanctions explicitly prohibited by Sec. 609." Id. at 439, 102 S.Ct. at 1872. Moreover, the court held that Title I [Sec. 101 et seq.] "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." Id. at 441, 102 S.Ct. at 1873 (footnote omitted).
 
 B.
 
 15
 With this discussion in mind, we turn to the facts of the present case. Cehaich concedes that the principles of Finnegan are controlling in his case. However, he seeks to distinguish the two cases on a factual basis. Most importantly, he refers this court to footnote 11 in Chief Justice Burger's opinion. That footnote explicitly "leave[s] open the question of whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees." Id. at n. 11. Cehaich asks this court to remand the case so that the district court might conduct further factfinding on his role as a benefit representative. We decline this invitation.
 
 
 16
 Cehaich also held a dual status as an officer and member of the union. These were distinct roles and union action affecting one did not necessarily affect the other. Cehaich's status as a member of the union remained unchanged after his dismissal from his position as a union officer. No fine, suspension, expulsion, or disciplinary action has been taken against him which will affect his rights as a member of the bargaining unit.[7]
 
 
 17
 On the other hand, Cehaich has lost his position as an unpaid union officer. He is no longer entitled to exercise the rights and privileges attendant with the appointive office which he once held. Yet, dismissal from his office "does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen to be union [officers]." Finnegan, 456 U.S. at 438, 102 S.Ct. at 1871. As the Supreme Court observed, "we discern nothing in Sec. 609 or its legislative history, to support petitioner['s] claim that Congress intended to establish a system of job security or tenure for appointed union employees." Id.
 
 
 18
 Although the "relationship between Secs. 102 and 609 is not entirely clear,"[8] we acknowledge that a cause of action may be maintained under section 102 quite apart from the cause of action under section 609. However, under the facts of this case, the result is the same. Section 101(a)(2) protects the rights of union members to meet, assemble freely with other members, and to express their opinions at labor meetings. Though Congress was concerned with the rights of union members to freely express their opinions, the courts have refused to read section 101(a)(2) "as incorporating the entire body of First Amendment law." United Steelworkers of America v. Sadlowski, 457 U.S. 102, 102 S.Ct. 2339, 2344, 72 L.Ed.2d 707 (1982). Thus the protections provided by section 101(a)(2) are not coextensive with those provided by the Constitution. Id. Hence, the analysis set forth in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) is not controlling.
 
 
 19
 We agree with the district court that Cehaich has not presented a case cognizable under the Act. Cehaich was appointed to his position as benefits representative to implement the benefits policy of the union local. He was not chosen because of any special expertise in the area. Rather, he was chosen because elected union leaders trusted him to implement its policies and strategies. When the leadership lost its faith in his abilities to do so, a political decision was made to replace him.
 
 
 20
 We find Cehaich's attempt to characterize the office of benefits representative as "nonpolicymaking and nonconfidential" unpersuasive. One of the most sensitive functions performed by a union is the securing of benefits and the resolution of issues surrounding the rights to benefits. This is of particular concern to union officers since it provides one of the most visible means for the union to show that it is meeting the needs of its members. This requires the adoption of union strategy in terms of the representation of union claimants, the union's interpretation of benefit provisions under the contract, and the formulation of a union position on various types of benefits.
 
 
 21
 Any union member is certainly entitled to disagree with the union's policy. However, when persons chosen by the union leadership are appointed to effectuate that policy, elected union officers are investing the appointee with the trust of the membership. When that trust is lost, not only will the appointee be subject to removal; but the elected official has placed his office in jeopardy also.[9] For that reason, the courts have been reluctant to interfere with the right of elected union officers to select their own administrators. Rather, they have recognized that the ability of union leaders to choose a staff with ideas compatible with their own "is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." Finnegan, 456 U.S. at 441, 102 S.Ct. at 1873.
 
 
 22
 Nor does footnote 11 of the Supreme Court's opinion in Finnegan require that the court conduct a detailed review of the dismissed officer's prior duties. Footnote 11, as well as the concurring opinion of Justice Blackmun, is concerned with rank-and-file employees. That is, the court leaves open the question of whether persons who will not "be instrumental in evolving the president's administrative policies" should be subject to the same type of summary dismissal. See Finnegan, 456 U.S. at 442, 102 S.Ct. at 1873 (Blackmun, J., concurring).[10] This protection can be afforded to rank-and-file employees without determining their daily duties. The question is whether the employee can correctly be considered an instrumental part of the union administration. Accord, National Labor Relations Board v. Local 212, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, 690 F.2d 82, 85 (6th Cir.1982) (per curiam). We have no problem finding on this record that Cehaich's position as a benefits representative made him a part of the union administration and that his status as a union official was not protected by section 101(a)(2).[11]
 
 
 23
 It follows a fortiori from the foregoing discussion that Cehaich was not statutorily entitled to the protections afforded in section 101(a)(5). Cehaich was not disciplined in any manner which affected his right to fully enjoy the rights and privileges of union membership. Therefore, the union was not required to afford him the procedural protections of the Act. We express no opinion on the question of whether the union's bylaws or constitution contain such a requirement. This is an internal matter of union governance. If the union has no such requirements, then Cehaich is free to attempt to change the union's internal rules. However, we deal here with congressionally mandated protections. Those enumerated protections reflect the view that "Congress simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff." Finnegan, 456 U.S. at 442, 102 S.Ct. at 1873.
 
 
 24
 In sum, we find no error in the district court's dismissal of Cehaich's claims. Though the Supreme Court had not yet decided Finnegan v. Leu, the district court correctly analyzed the intended purpose of the LMRDA. Accordingly, we affirm the judgment of the Honorable Anna Diggs Taylor of the United States District Court for the Eastern District of Michigan.
 
 
 
 [1]
 The Benefits Plan Provisions of the Supplemental Agreement between the company and the union contains the relevant provisions. Sections 1-4 establish procedures for determining the number of benefit representatives to be assigned to each plant. Section 5 requires that the local benefits representative must be retained on the shift to which he was assigned when he was appointed to the position, "provided there is a job that is operating on his assigned shift which is within his job classification and which he is able to perform."
 Section 6 sets forth the duties of the local union benefit representatives: It states:
 
 
 [6]
 The Benefit Plans--Health and Safety office may be used by the local union benefit representatives during their regular working hours:
 (a) To confer with retirees, beneficiaries, and surviving spouses who ask to see a benefit representative with respect to legitimate benefit problems under the Pension and Insurance Agreements.
 (b) If the matter cannot be handled appropriately in or near the employee's work area, to confer with employees who, during their regular working hours, ask to see a benefit representative with respect to legitimate benefit problems under the Pension, Insurance and SUB Agreements.
 (c) To confer with employees who are absent from, or not at work on, their regular shift and who ask to see a benefit representative with respect to legitimate benefit problems under the Pension, Insurance and SUB Agreements.
 (d) To write position statements and to complete necessary forms with respect to any case being appealed to the SUB or Pension Boards, and to write appeals with respect to denied life, health care, and disability claims.
 (e) To file material with respect to the Pension, Insurance and SUB Agreements.
 (f) To make telephone calls with respect to legitimate benefit problems under the Pension, Insurance and SUB Agreements.
 
 
 [2]
 For example, the leaflet stated:
 IT'S A SELL OUT
 Read the Fine Print Now--Before It's Too Late
 WHY ARE 4,000 G.M. BENEFIT REPS, AND APPRENTICE REPRESENTATIVES BEING SHIPPED LIKE SO MUCH BAGGAGE TO DALLAS, TEXAS FOR AN EXPLANATION OF THIS AGREEMENT. THERE IS NOTHING IN THIS AGREEMENT FOR THE INPLANT WORKER. WE ARE PAYING THE WHOLE COST OF THE RETIREES BENEFITS. FRASER MUST HAVE THOUGHT HE WAS NEGOTIATING WITH CHRYSLER AND NOT GENERAL MOTORS WHO MADE 4 BILLION DOLLARS OF PROFITS LAST YEAR. COMMITTEEMEN AND CHAIRMEN WILL BE THE VICTIMS OF THIS CONTRACT IN THE NEXT SET OF ELECTIONS.
 
 
 [3]
 Section 101(a)(2) of the Labor Management Reporting Disclosure Act (LMRDA) is part of what is popularly called the Union Members' Bill of Rights. This section, codified at 29 U.S.C. Sec. 411(a)(2), provides:
 Freedom of speech and assembly.--Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.
 
 
 [4]
 Section 609 of the LMRDA, 29 U.S.C. Sec. 529, is also a part of the Union Members' Bill of Rights. It provides in relevant part:
 It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.
 
 
 [5]
 Section 101(a)(5) of the LMRDA sets forth the following procedural safeguards for the protection of the rights of union members:
 Safeguards against improper disciplinary action.--No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
 
 
 [6]
 See Finnegan v. Leu, 456 U.S. 431, 433 n. 1, 102 S.Ct. 1867, 1869 n. 1, 72 L.Ed.2d 239 (1982) and cases cited therein
 
 
 [7]
 Indeed, Cehaich could once again be appointed to the benefits representative position if the local union leadership changed and Walker was replaced. He has not been accused of any wrongdoing which would prohibit him from being elected or appointed to any position in the union. His views are merely incompatible with those of the present leadership
 
 
 [8]
 See Finnegan v. Leu, 456 U.S. at 439-40 n. 10, 102 S.Ct. at 1872-1873 n. 10. As noted by the Supreme Court, section 609 is directed to "retaliation for the exercise of any right secured under the Act whereas Sec. 102 protects only rights secured by Title I." Id. Therefore to the extent that a plaintiff's cause of action is premised on acts that allegedly violate Sec. 102, the legal result should be the same under both sections
 
 
 [9]
 We find the analysis made by the union at oral argument persuasive. When rank-and-file union members are dissatisfied with the policy positions being taken by benefit representatives in their official capacity, they naturally seek to oust the person or persons responsible for their discontent. Since the union members cannot remove the appointed benefits representative directly, their alternative is to remove the elected union officials responsible for his or her appointment. Union leaders have the right to be assured that appointed administrators are loyally effectuating union policies. Neither the LMRDA nor its legislative history suggest that Congress intended to prohibit elected union officials from protecting their positions from renegade appointed administrators. See Finnegan v. Leu, 456 U.S. at 441, n. 12, 102 S.Ct. at 1873 n. 12
 
 
 [10]
 We note that the concerns expressed by Justice Blackmun in his concurring opinion in Finnegan, 456 U.S. at 442, 102 S.Ct. at 1873, are implicated to an even lesser extent in this case. In Finnegan, the discharged business agents were employees of the union. Here, Cehaich was not an employee, but an unpaid appointed union official. He, therefore, retains his means of livelihood, his position as a machine repair machinist
 However, Cehaich maintains that he did lose an important part of his job. He maintains that he lost the right to perform union duties during his regular working hours which was an integral part of the benefits representative position. We find this argument meritless. The short answer to this contention is a reiteration of the Supreme Court's holding in Finnegan that Sec. 101(a)(2) was not meant to vest rights in appointed administrative positions to any one union member.
 
 
 [11]
 The question before this court is not whether it might have been better to afford Cehaich some or all of the protections guaranteed by the Act. The union leadership might actually inspire more confidence in its commitment to open and free debate if it did so. However, Congress has not made the failure to provide such protections to those in Cehaich's position a matter of federal concern