**Jeffrey C. HARVEY, Plaintiff–Appellant,**

v.

**Daryl H. HOLLENBACK; Bricklayers and Allied Craftsmen International Union; International Union of Bricklayers and Allied Craftsmen, Local 9; International Union of Bricklayers and Allied Craftsmen Central Michigan Administrative District Council, AFL–CIO, Defendants–Appellees.**

No. 96–1035.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 5, 1996.

Decided May 20, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied June 19, 1997.

Ellis Boal, argued and briefed, Detroit, MI, for Jeffrey C. Harvey.

Christopher P. Leegghio, argued and briefed, Miller, Cohen, Martens, Ice & Geary, Southfield, MI, for Daryl Hollenback.

Ann E. Neydon, argued and briefed, Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detriot, MI, Seymour M. Waldman, briefed, Vladeck, Waldman, Elias & Engelhard, New York City, for Bricklayers and Allied Craftsmen Intern. Union, International Union of Bricklayers and Allied Craftsmen, Local 9, International Union of Bricklayers and Allied Craftsmen Cent. Michigan Administrative Dist. Council, AFL–CIO.

Before: WELLFORD, SILER, and MOORE, Circuit Judges.

## AMENDED OPINION

WELLFORD, Circuit Judge.

Plaintiff Jeffrey C. Harvey, a former local union official, brings this action against several labor unions and one of the present local union officials, Daryl Hollenback, asserting a violation of his right to freedom of expression as set out in Title I of the Labor–Management Reporting and Disclosure Act (hereinafter "LMRDA"). After discovery, the defendants moved for summary judgment, and in addition, several of them filed a counterclaim against plaintiff Harvey. In response, Harvey moved for sanctions against Hollenback and Local 9, arguing that the counterclaim was filed for the improper purpose of harassment and confusion of the issues. The district court ultimately granted summary judgment in favor of the defendants and denied Harvey's motion for sanctions.

## I. FACTS

In 1985, the International Union of Bricklayers and Allied Craftsmen (hereinafter "IU") established the Project 2000 Committee to develop an organizational strategy and long-range plan for national consolidation. Pursuant to that plan, the IU established sixteen Administrative District Councils, including the Central Michigan Administrative Council (hereinafter "CMAC") in April 1992. The CMAC was to be an intermediate union body designed to assume the administrative functions previously performed by the locals.

The CMAC's organizational structure included a Director and an Executive Committee (hereinafter "EC"), and although the IU initially appointed persons to those offices, they were to become elected positions beginning in March 1994. Defendant Hollenback was chosen by the IU to serve as the first CMAC Director, and the EC was chosen from a group of elected officials from the various local union organizations. The members of the EC were also hired to work as union field representatives.

In January 1993, Hollenback appointed plaintiff Harvey, then President of Local 14, to take the place of a retiring member of the EC. He was also hired as a union field representative. Shortly thereafter, Harvey and a few other EC members filed internal charges against Hollenback claiming that he that he had "doctored" EC minutes and that he was wasting union resources needlessly in de-

fending certain National Labor Relations Board lawsuits. These individuals, including plaintiff, eventually managed to have Hollenback summarily removed from office without any opportunity for a hearing. The IU stepped in, however, and restored Hollenback to his former position pending an investigation of the charges, which were ultimately found to be lacking substance.

In the meantime, the CMAC, experiencing financial problems due to a shrinking membership, decided to eliminate three of the field representative positions and to cut the pay of those remaining by twenty percent. As might be expected, the field representatives objected to this solution to the CMAC's financial woes. Since most of them also served on the EC, they organized an effort, led by Harvey, to schedule a special delegated convention to instead consider a membership dues increase. Although Hollenback agreed to schedule a convention on August 28, 1993, he openly opposed Harvey's proposal for a dues increase because he felt that it would be unfair to their already struggling members. Within a week, Hollenback received threats, his tires were slashed on two different occasions, and a rifle was fired into his office during nonbusiness hours. Soon after these incidents, the IU again intervened and postponed the special convention pending an opportunity for public hearing and further evaluation of its own alternative plan to address the CMAC's problems, including another restructuring of the local unions.

During this time, Harvey outspokenly criticized the IU restructuring plan, but the IU went forward with the plan and merged the local union organizations into a mega-local named Local 9. With the establishment of Local 9, the IU terminated the CMAC and all of its field representatives. It then appointed Local 9's initial officers, with elections scheduled to take place within two years. Hollenback was appointed President, and most of the officers and field representatives of the defunct CMAC were appointed to substantially similar positions within Local 9. This included at least two of the EC members who had joined Harvey in making the earlier charges against Hollenback. Harvey, however, was not carried over into the new management structure. This forms the basis for his claim in this suit.

Harvey claims that he was essentially terminated in violation of his right to freedom of expression as guaranteed by Title I of LMRDA. His original complaint sought a number of remedies, including the rescission of the charter of Local 9, reinstatement of the council and the previous local unions, reinstatement of plaintiff as a field representative of the council, an order mandating a convention of council delegates and an acceleration of union elections, as well as damages and costs.

The district court denied Harvey's motion for a permanent injunction accelerating the election of Local 9 officers from December 1995, to December 1994, after finding that the Department of Labor, rather than the district court, had jurisdiction of what was essentially a claim under Title IV of LMRDA. Furthermore, Harvey eventually abandoned all claims for relief related to restructuring of the council and affiliated local unions, including the convention and election, amending his complaint to seek only a broad "cease and desist" order.

After prolonged discovery, the defendants moved for summary judgment. The district court granted the motion holding that "there is no direct evidence of interference with the free speech rights of the members of what is now Local 9 and there is no evidence from which an inference can be drawn that there was interference with their free speech rights."

The issue before us, then, is whether the defendants violated Harvey's LMRDA Title I rights when he was not appointed as an officer and field representative in the new consolidated Local 9 after the merger of the preexisting locals. For the reasons stated below, we hold that Harvey has not established that his right to freedom of expression was violated. We therefore **AFFIRM** the decision of the district court.

## II. *STANDARD OF REVIEW*

We review *de novo* a district court's grant of summary judgment. *LaPointe v. United*

642

*Autoworkers Local 600,* 103 F.3d 485, 487 (6th Cir.1996). "[S]ummary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Collyer v. Darling,* 98 F.3d 211, 220 (6th Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). "[W]here the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence, he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." *White v. Turfway Park Racing Ass'n,* 909 F.2d 941, 944 (6th Cir.1990) (citing *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989)).

### III. *ANALYSIS*

 Introduced as the "Bill of Rights of Members of Labor Organizations," Congress enacted Title I of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. §§ 411–415, for the purpose of providing union members with a right to freedom of expression that would in turn help ensure that unions would be democratically governed. *Finnegan v. Leu,* 456 U.S. 431, 435–36, 102 S.Ct. 1867, 1870–71, 72 L.Ed.2d 239 (1982). LMRDA states in relevant part that:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

MRDA, § 101(a)(2), 29 U.S.C. § 411(a)(2). These rights are limited, though, to individuals in their distinct capacities as *members,* not as officers or employees as such. *See Finnegan,* 456 U.S. at 436–42, 102 S.Ct. at 1870–74; *see also Thompson v. Office and Professional Employees Int'l Union, AFL–CIO,* 74 F.3d 1492 (6th Cir.1996); *Cehaich v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America,* 710 F.2d 234 (6th Cir.1983).

Section 609 of LMRDA makes it unlawful for a labor organization to "discipline" a member for exercising his rights. 29 U.S.C. § 529. In *Finnegan,* the Supreme Court concluded that the term "discipline" refers only to punitive actions that directly diminish a union member's rights or status as a member of the union. 456 U.S. at 438, 102 S.Ct. at 1871–72. Like Harvey, the plaintiffs in that case had been dismissed from appointed union positions. *Id.* at 434–35, 102 S.Ct. at 1869–70. They were fired by an incoming union leader because they had actively supported his opponent in a recent union election. *Id.* The Supreme Court held that the plaintiff could not maintain an action for improper "discipline" under § 609 because "discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen to be union employees." *Id.* at 431, 102 S.Ct. at 1868. The court noted that by enacting LMRDA, Congress did not intend to provide job security or tenure for those who just happen to maintain a dual status as both member and as employee or appointed official of a union. *See id.* at 437–38, 102 S.Ct. at 1871–72.

Our court has consistently maintained this careful distinction between an individual's role as a member and his role as an employee or appointed officer. For example, in *Cehaich* an employee brought a claim against his union employer alleging that his Title I right to free expression had been violated by virtue of his termination. 710 F.2d at 234. Observing that member and officer roles were "distinct" and that one "did not necessarily affect the other," we held that since there was no fine, suspension, or disciplinary action that had been taken against the plaintiff, he could not maintain an action against

the union because his "status as a member of the union remained unchanged after his dismissal." *Id.* at 238. By comparison, we upheld a judgment in favor of a dismissed union business representative in *Thompson* precisely because he had also been expelled from the union as part of his termination. 74 F.3d 1492.

■ This case is most like *Cehaich* in the sense that Harvey has not seriously attempted to allege any facts tending to show that his dismissal caused any direct restraint on his membership rights. He was not expelled, fined, or suspended, and by his own admission, he was allowed to continue to criticize union leadership. As a consequence, he cannot maintain an action under § 609.

There is, however, another statutory provision under which LMRDA claims may be brought, and it is upon this section that Harvey primarily relies. Section 102 provides a right of action to members "whose rights ... have been *infringed* .. .," 29 U.S.C. § 412 (emphasis added), which the Supreme Court has acknowledged is a somewhat broader concept than the term "discipline" in § 609. *See Finnegan,* 456 U.S. at 439, 102 S.Ct. at 1872. Specifically, the Supreme Court has noted that a claim might nevertheless arise from the dismissal of a union employee or official if it were "part of a purposeful and deliberate attempt to ... suppress dissent within the union." *Sheet Metal Workers' International Association v. Lynn,* 488 U.S. 347, 355 n. 7, 109 S.Ct. 639, 645 n. 7, 102 L.Ed.2d 700 (1989) (quoting *Schonfeld v. Penza,* 477 F.2d 899, 904 (2d Cir.1973)).[1] Accordingly, Harvey argues that the restructuring of the union and the concomitant delays of the convention and election were part of a larger, concerted effort by the defendants to quash his insurgent leadership in an attempt to suppress overall dissidence within the rank-and-file membership.

■ In evaluating Harvey's contention, it is important to continue to distinguish his role as a member from his role as an employee/official of the union. Even under § 102,

Harvey is limited to "preserving only his rights as an individual member, and his right to bring that action is no greater than that of any individual member of the union [whose rights are infringed] as a result of the action taken against [him]." *Adams–Lundy v. Ass'n of Professional Flight Attendants,* 731 F.2d 1154, 1158 (5th Cir.1984) (explaining the Second Circuit's opinion in *Schonfeld* cited in both *Finnegan* and *Lynn* ). Harvey must be able to show that his rights were infringed in the same way that any other member's rights might have been infringed by his dismissal, independent of any harm that resulted merely from the loss of his job.

The Supreme Court has failed to explain what circumstances might constitute a "purposeful and deliberate attempt ... to suppress dissent within the union," *see, e.g, Finnegan,* 456 U.S. at 440–41, 102 S.Ct. at 1872–73; however, it seems clear that claims of infringement are "judged by reference to the LMRDA's basic objective: 'to ensure that unions [are] democratically governed, and responsive to the will of the union membership....'" *Lynn,* 488 U.S. at 354, 109 S.Ct. at 644 (quoting *Finnegan,* 456 U.S. at 441, 102 S.Ct. at 1873). In *Finnegan,* a newly elected union leader was able to fire appointed union officials who had campaigned against him because ultimately, he was expressing the will of the majority by selecting a staff that shared his views and could be trusted to faithfully execute and implement his policies. *See Lynn,* 488 U.S. at 355, 109 S.Ct. at 644–45 (explaining *Finnegan* ). Furthermore, in *Lynn,* the same principle led the court to hold that an elected official who had been dismissed, as opposed to an appointed one, had stated a cause of action under § 102 because "[n]ot only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him." *Id.*

This case is unique in the sense that due to the delays from the restructurings, none of the officials relevant to this action had ever been actually elected to a post within the

---

1. The Supreme Court has made clear that such a formulation is not the exclusive means to establish a violation of § 102, *see Lynn,* 488 U.S. at 355 n. 7, 109 S.Ct. at 645 n. 7; however, it serves as the basis for Harvey's claim in this action.

CMAC or Local 9.[2] We cannot, therefore, identify with any degree of confidence which faction of the union might be expected to ultimately vindicate the democratic principle of majority rule.

■ Nevertheless, the plaintiff would still carry the burden of showing that his dismissal was part of a deliberate plan to stifle the democratic process within the labor organization. We concur with the district court's observation in *Stroud v. Senese* that "plaintiffs face an 'uphill battle' in proving such a scheme." 832 F.Supp. 1206, 1213 (N.D.Ill. 1993) (quoting *Glover v. Ossey*, No. 93 C 0421, 1993 WL 303120, at *3 (N.D.Ill. Aug.5, 1993)). We have examined the evidence of defendants' motivation and actions, *de novo*, but we do not substitute our judgment for that of the union under the circumstances, particularly to the extent Harvey claims due process violations. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1467–68 (6th Cir.1992). Harvey has failed to carry his burden in this case even by a preponderance of the evidence.

In this case, it is quite clear to us that Harvey would be unable to prevail in that uphill battle. The uncontested facts show that Harvey remained free, as did his supporters, to criticize openly the union's leadership and policies without retaliation. In fact, he concedes in his brief that he was unafraid to "say what he want[ed] at union meetings," and further that no one in his claimed "dissident group" actually experienced any retaliation for voicing their views, including at least two members of the EC that had previously sided with Harvey in filing the initial charges against Hollenback and who were rehired as officials in Local 9. In that same vein, since the rights Harvey claims were violated as a result of his dismissal were similar to rights of other members of the union as well, we think it worth noting that he is the only one that has seen fit to challenge the action of defendants.

In addition, we also think it significant that Harvey was able to eventually mount a legitimate campaign for Hollenback's position, and although his bid was ultimately unsuccessful, there was no allegation of improper activity or reprisals from the defendant. This hardly smacks of an anti-democratic regime. These facts are in marked contrast to those in both *Schonfeld*, 477 F.2d at 903, and *Thompson*, 74 F.3d at 1509, which are the primary cases cited by plaintiff, where the dismissed employee was not only removed from his appointed union position but was also rendered ineligible from further seeking union office for five years.

Harvey's arguments are grounded in innuendo and would be insufficient to meet the heightened standard he would face at trial. Essentially, they amount to a theory that all of the defendants participated in a grand conspiracy to restructure the union organization with the primary purpose of eliminating him from the leadership without any regard to the immense cost, risk, and effort involved. We do not believe that Harvey has presented sufficient evidence in support of this questionable contention to prevail before a jury.

In the final analysis, the real gist of this lawsuit is simply Harvey's loss of his job. In fact, his claim for damages was calculated not by an amount corresponding to the alleged harm he suffered from the infringement of his *membership rights* but by reference to the wages he lost as a result of his dismissal. At oral argument, plaintiff's counsel conceded that, in light of Harvey's stated desire to vindicate his right of free expression, such a measure of damages was questionable. Plainly stated, Title I of LMRDA does not provide a cause of action for wrongful termination, even if the termination was indeed wrongful.

In conclusion, Harvey simply has not made a·sufficient showing of a genuine issue of material fact suggesting that the defendants deliberately and intentionally attempted to suppress dissent on the part of union mem-

**2.** There are suggestions in Harvey's brief that he should be treated as an elected official, as in *Lynn*, because Hollenback and the IU decided to appoint individuals to positions within the CMAC from a group of people that also happened to hold elected offices in the local union organiza-

tions. We find this argument meritless because, in fact, Harvey was *not* elected to any position in the CMAC. Therefore, these facts do not come within the framework, nor fit the pattern, of the plaintiff in *Lynn*.

bers which thereby undermined the democratic processes of the union. In light of this failure, we **AFFIRM** the district court.

### IV. *SANCTIONS*

Without the necessity of going into great detail concerning the issue of sanctions by reason of certain defendants filing a counterclaim, we **AFFIRM** the exercise of discretion on the part of the district judge in this respect.