AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, LOCAL 1738, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

No. 85–1609.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 10, 1986.

Decided Dec. 12, 1986.

Margaret Pena, with whom Mark D. Roth, Washington, D.C., was on the brief for petitioner.

Pamela P. Johnson, Attorney, Federal Labor Relations Authority, with whom Ruth E. Peters, Sol. and Steven H. Svartz, Deputy Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief for respondent.

Before EDWARDS and SILBERMAN, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by EDWARDS, Circuit Judge.

HARRY T. EDWARDS, Circuit Judge:

Kenneth Poteat, an employee at the Veterans Administration Medical Center, Salisbury, North Carolina (the "Agency"), was removed from a union steward position by Local 1738 of the American Federation of Government Employees ("AFGE" or the "Union"). The Agency charged that the Union's action in removing Poteat as one of its officers was an unfair labor practice under the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101–7135 (1982) (the "Statute"). After a hearing on March 24, 1981, the Administrative Law Judge (the "ALJ") recommended that the complaint, alleging violations of sections 7116(b)(1) and (3) of the Statute,[1] be dismissed in its entirety. The Federal Labor Relations Authority ("FLRA" or the "Authority") agreed that section 7116(b)(1) had not been violated but found that the

1. 5 U.S.C. § 7116(b) (1982) provides in pertinent part:

(b) For the purpose of this chapter, it shall be an unfair labor practice for a labor organization—

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

.    .    .    .    .

Union's action constituted an unfair labor practice under section 7116(b)(3). This appeal followed.

Because the FLRA's opinion in this case does not set forth any comprehensible interpretation of section 7116(b)(3), we cannot determine whether the Authority's decision is supported by substantial evidence. Consequently, we remand the case to the FLRA so that it may clarify its interpretation of section 7116(b)(3) and indicate what, if any, evidence supports a finding that the Union violated section 7116(b)(3).

On remand, the FLRA must reconcile its reading of section 7116(b)(3) with the heretofore inviolate principle that unions may choose their officers as they see fit, so long as the organization adheres to established, lawful procedures. In particular, the Authority must explain how, on the facts of this case, a violation of section 7116(b)(3) may be found without impinging on matters of internal union management that are traditionally left to union discretion.

## I. BACKGROUND

Kenneth Poteat was hired as a housekeeper at the Agency in December 1979 and was assigned to work in the psychiatric ward in August 1980. He was one of about forty or fifty Building Management employees in the nonprofessional unit. When one of the two Union steward positions servicing the Building Management employees in the nonprofessional unit became vacant, Poteat was selected to fill the vacancy.

From all accounts, Poteat was not an exemplary steward. He never took part in representational duties, had only attended one Union meeting and he was thought to be "cultivating" a relationship with the employer's building manager. Early in September 1980, some Union members began complaining about Poteat's performance as steward. The Union decided to give Poteat some more time in which to improve his performance.

On September 28, 1980, Poteat observed a nursing assistant allegedly punching and kicking a patient in the psychiatric ward. The Agency had a policy that provided that "[a]n employee who witnesses any unkindness, rudeness, or violence of any kind toward a patient and does not promptly report it to the proper authority is subject to disciplinary action." [2] After conferring with the building manager and the employee, Poteat reported the incident to the Hospital Assistant Director.

When other members of the bargaining unit discovered that Poteat reported the incident, there was a widespread call for his removal. After conducting a poll of the Building Management employees, Union officials told Poteat that "nobody wanted him there anymore, and that he 'could resign or be resigned.' " [3] After he refused to resign, the Union removed him from his position on October 2, 1980. The Union stated in a letter to Poteat that its reason for removing him was that the Union members did not trust him.[4] The Union had also circulated a statement, which thirty members signed, to the effect that Poteat is "a person who exaggerates and misrepresents the truth." [5] In addition, it appears that the other steward in the unit was unwilling to serve as a Union officer if Poteat was not removed.[6] Poteat's report led to a fourteen-day suspension of the nursing assistant. In a grievance proceeding initiated by the employee, the grievance was sustained; the employee was awarded full back pay, full seniority and the incident

---

(3) to coerce, discipline, fine, or attempt to coerce a member of the labor organization as punishment, reprisal, or for the purpose of hindering or impeding the member's work performance or productivity as an employee or the discharge of the member's duties as an employee;

. . . .

2. Exhibit GC–3, *reprinted in* Joint Appendix ("J.A.") 142.

3. Decision of the ALJ ("ALJ Op."), 19 F.L.R.A. 524, 527 (1982).

4. Exhibit GC–4, *reprinted in* J.A. 145.

5. Union Exhibit 5, *reprinted in* J.A. 163–64.

6. ALJ Op., 19 F.L.R.A. at 527 n. 4.

was removed from his record.[7] Poteat did not file charges against the Union concerning his removal.

On December 30, 1980, the General Counsel of the FLRA issued a Complaint and Notice of Hearing, alleging that the Union had violated sections 7116(b)(1) and (3) by removing Poteat as steward. The ALJ found that the Union's purpose in removing Poteat was not punishment or reprisal, but that Poteat was removed because he could no longer function effectively as a union steward. The ALJ concluded that section 7116(b)(1) had not been violated because being a Union officer is not a right granted by the Statute, but is a matter of internal Union policy. As for section 7116(b)(3), the ALJ was "reluctant, in the absence of any indication that Congress meant to intrude into the relationship between a labor organization and its officers, to conclude that Section 7116(b)(3) was intended to protect members from anything more than the traditional sanctions used against members."[8] He also noted that if a violation of section 7116(b)(3) was found on these facts, it would be difficult for the Union to remove Poteat in the future without risking litigation concerning the Union's motives.[9] As a policy matter, the ALJ found strong arguments in favor of dismissing the action: "The consequences for effective and cohesive leadership of the Local are obvious, whereas the usefulness of issuing and policing such a remedy is questionable."[10]

The FLRA rejected the ALJ's section 7116(b)(3) analysis:

> Section 7116(b)(3) makes it an unfair labor practice for a labor organization to "coerce, discipline, fine, or attempt to coerce a member of the labor organization as punishment, reprisal, or for the purpose of hindering or impeding the member's work performance or produc-

tivity as an employee or the discharge of the member's duties as an employee[.]"

> As found by the [ALJ], all agency employees are required to sign a memorandum which provides that an employee who "witnesses any unkindness, rudeness, or violence of any kind toward a patient and does not promptly report it to the proper authority is subject to disciplinary action," including discharge. Poteat filed such a report which led to his removal as steward. The Authority finds that the Union's action in removing Poteat as steward in the circumstances of this case had the effect of coercing him or disciplining him for the purpose of hindering or impeding his work performance or the discharge of his duties as an employee. The Union's removal of Poteat thus violated section 7116(b)(3) of the Statute.[11]

The FLRA neither explained its reading of the statutory language nor pointed to any other facts in the record to support its finding of a violation of section 7116(b)(3).

## II. ANALYSIS

In reviewing this case, we are to determine whether the FLRA applied the proper legal test to the facts, and, assuming that it did, whether there was substantial evidence to support its findings. We are unable to engage in such review because the opinion of the FLRA does not indicate what test is to be applied; nor does it state what evidence, if any, supports a finding that section 7116(b)(3) was violated.

### A. Statutory Interpretation of Section 7116(b)(3)

#### 1. Interpretation of the Statute

Both parties insist that their "conclusions are not only reasonable, but are compelled by the plain language of the Statute," which "means exactly what it says."

---

7. *See Veterans Admin. Medical Center v. Local 1738, AFGE,* No. 81–K–04328 (1981) (Hall, Arb.), *reprinted in* Brief for Petitioner, Addendum B at 25.

8. ALJ Op., 19 F.L.R.A. at 533.

9. *Id.* at 534.

10. *Id.*

11. *AFGE, Local 1738,* 19 F.L.R.A. 520, 521 (1985).

*NTEU v. FLRA,* 721 F.2d 1402, 1406 (D.C. Cir.1983) (*"NTEU"*). However, the language of section 7116(b)(3) is far from clear. Indeed, we have trouble understanding the section's meaning simply as a matter of grammar.[12] In any event, several meanings of the "plain language of the Statute" are possible.

One possible meaning is that the Union's action must be *intended* to coerce, discipline or fine one of its members. This reading, implied by the inclusion of "attempt to coerce" in the list of prohibited actions, is certainly plausible. However, if the section is so viewed, there appears to be nothing in the record of this case to support a violation of the section 7116(b)(3). Thus, it is possible that the FLRA reads the provision as merely requiring a coercive *effect.* However, if an effects test is embodied in section 7116(b)(3), the inclusion of "attempt to coerce" would be anomalous, since failed attempts to coerce could not have coercive effects. This leaves a third possible reading, namely that the Statute is violated if the Union's action has a coercive, disciplinary or punitive effect or was intended to have a coercive effect. We do not know which of these three readings the FLRA has adopted.

The second portion of section 7116(b)(3) is no clearer. Again the issue is whether the Union's action had to have the *purpose* of punishment or reprisal or whether an *effect* is sufficient. Assuming an appropriate standard is then placed on punishment or reprisal, we need to know where to complete the clause. Specifically, can the action be punishment or reprisal impeding the member's work performance or productivity or is it limited to punishment or re- prisal for the discharge of the member's duties as an employee? The latter meaning, suggested by the Executive Order's language, is difficult to infer from the grammatical structure of section 7116(b)(3) as written.

The FLRA, as the agency charged with administering the Statute, must carefully examine the meaning of section 7116(b)(3) and explain its application so that affected parties may understand its limits. The FLRA apparently reads this section of the Statute as if its meaning were self-evident. We do not find it to be so, nor would we expect the affected parties to comprehend its meaning without further explanation from the FLRA. While it is true that we will give some deference to the FLRA's interpretation of the Statute, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must first understand that interpretation. We do not know what meaning the FLRA places on section 7116(b)(3), and so a remand to the FLRA is essential to allow the Authority to clarify its interpretation.

### 2. *Congressional Intent*

Given that no reading of section 7116(b)(3) is unmistakably clear, it is important that the FLRA harmonize its reading of the section with congressional intent. In doing so, the FLRA should look not only to the legislative history and the structure of the Statute, but also to analogous provisions in private sector legislation. *See Library of Congress v. FLRA,* 699 F.2d 1280, 1286 (D.C.Cir.1983); *Turgeon v. FLRA,* 677 F.2d 937, 939 (D.C.Cir.1982). It is notable that this case presents an Agency chal-

---

**12.** Section 7116(b)(3) appears to be derived from Executive Order 11491, as amended, which provided in section 19(b)(3) that a labor organization shall not "coerce, attempt to coerce, or discipline, fine, or take other economic sanction against a member of the organization as punishment or reprisal *for,* or for the purpose of hindering or impeding his work performance, his productivity, or the discharge of his duties owed as an officer or employee of the United States." Executive Order 11491, *reprinted in Legislative History of the Federal Ser-* *vice Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978,* at 1348 (emphasis added). As noted by our emphasis, the wording of the Executive Order has been changed in the Statute. The FLRA does not cite the Executive Order in its opinion, nor does it attempt to discuss whether section 7116(b)(3) is to be interpreted differently from the Executive Order. The omitted word "for" creates ambiguity in the grammatical construction of the sentence.

lenge to the Union's decision to remove one of its officers. This type of interference by management in the internal affairs of unions is unprecedented in the private sector. We would expect any discussion by the FLRA on remand to tackle this issue head-on.

In *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Supreme Court faced a similar issue under sections 101(a)(1) and (2) of the Labor-Management Reporting Disclosure Act ("LMRDA").[13] Those sections "guarantee equal voting rights, and rights of speech and assembly, to '[e]very *member* of a labor organization.'" 456 U.S. at 436, 102 S.Ct. at 1870 (emphasis supplied by the Court) (footnote omitted). An action was brought by union employees who were discharged as employees of the union after supporting another candidate in a union election under section 609 of the LMRDA,[14] which "renders it unlawful for a union or its representatives 'to fine, suspend, expel, or otherwise discipline any of its *members* for exercising any right to which he is entitled under the provisions of this Act.'" 456 U.S. at 436, 102 S.Ct. at 1870 (emphasis supplied by the Court) (footnote omitted). The Court viewed the issue as hinging on the nature of the union action taken:

> Petitioners held a dual status as both employees and members of the Union. As *members* of Local 20, petitioners undoubtedly had a protected right to campaign for Brown and support his candidacy. At issue here is whether they were thereby immunized from discharge at the pleasure of the president from their positions as appointed union *employees.*

*Id.* at 437, 102 S.Ct. at 1871.

The Court concluded that section 609 applied "only to retaliatory actions that affect a union member's rights or status *as a member* of the union." *Id.* Because "discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to

the extent that they happen also to be union employees," the LMRDA was not violated. *Id.* at 438, 102 S.Ct. at 1871. The Court rejected the idea that the firing was an indirect interference with membership rights, forcing a choice between free expression and jobs. *Id.* at 440, 102 S.Ct. at 1872. The Court found nothing in the language or legislative history of the LMRDA that "restrict[ed] the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Id.* at 441, 102 S.Ct. at 1873 (footnote omitted). On a related point, the Court found it "virtually inconceivable that Congress would have prohibited the longstanding practice of union patronage without any discussion in the legislative history of the Act." *Id.* at 441 n. 12, 102 S.Ct. at 1873, n. 12.

Section 7116(b)(3) should also be viewed within the context of labor-management relations in general. "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest...." *BATF v. FLRA,* 464 U.S. 89, 107, 104 S.Ct. 439, 449, 78 L.Ed.2d 195 (1983). A union steward must have the support of the members and be an effective advocate for the members in order for the collective bargaining process to work effectively. It follows that the selection process of a union officer should be an internal matter for the union. In this case, it is undisputed that Poteat was ineffective as steward. To require the Union to keep him in office is thus in tension with the purposes of collective bargaining that underlie the Civil Service Reform Act.

Under the National Labor Relations Act, the selection and removal of officers has long been viewed as an internal union matter. *See NLRB v. Wooster Division, Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). In the duty to bargain context, the FLRA has already similarly

---

13. 29 U.S.C. § 411(a)(1), (2) (1982).

14. 29 U.S.C. § 529 (1982). The Union employees' membership rights were unaffected by the Union's actions.

held that "it is within the discretion of ... labor organizations ... to designate their ... representatives when fulfilling their responsibilities under the Statute." *AFGE (Wright-Patterson Air Force Base),* 4 F.L.R.A. 272, 274 (1980). Although the Agency has a legitimate interest in ensuring that its employees execute their jobs free of Union coercion, this does not necessarily translate into an ability to challenge the removal of officers when no Union action is taken on a member *as a member.* Further, so long as the action does not affect the employee's performance of his job, there is no reason to delve into internal union affairs. Indeed, this is recognized in the Labor-Management Agreement between the Agency and the Union, where the parties have expressly provided: "It is agreed that the designation of stewards and the area of assignment is internal business of the Union." [15] Absent some explicit findings of congressional intent, the FLRA should be hesitant to alter this result.[16]

### B. *Application of Section 7116(b)(3) to the facts*

Since we will remand this case for further consideration by the FLRA, we will defer judgment on the question of substantial evidence. Nevertheless, to ensure adequate review by the Authority, we will highlight certain inquiries that must be made on remand. We do this because, on the record before us, there is a substantial question whether a violation of the Act may be found on *any* plausible reading of section 7116(b)(3).

We begin with the findings of the ALJ, which were adopted by the FLRA. The ALJ found that Poteat was removed because he was not and could no longer be an effective steward. There is no evidence that any Union officer told Poteat that he should not have reported the alleged incident of patient abuse. At most, the Union's position was that it would have been prudent, given Poteat's lack of a frame of reference in determining what constituted patient abuse, to discuss the matter prior to reporting it.[17] Moreover, *there is no evidence that the Union has ever taken any action against one of its members for reporting patient abuse or would do so in the future.*

The FLRA, whatever it found, clearly did not see the Union's action as constituting a punishment or reprisal. Further, the Union's action cannot sensibly be viewed as a fine. Thus, the application of section 7116(b)(3) in this case has to be limited to whether the Union had engaged in a practice "to coerce, discipline ... or attempt to coerce a member of the labor organization ... for the purpose of hindering or impeding the member's work performance or productivity *as an employee* or the discharge of the member's duties *as an employee.*" 5 U.S.C. § 7116(b)(3) (1982) (emphasis added). There is certainly no evidence that the action had any coercive or disciplinary *intent,* and the FLRA does not suggest oth-

---

15. J.A. 123.

16. *National Treasury Employees Union, Chapter 53,* 6 F.L.R.A. 218 (1981) ("*NTEU Chapter 53*") does not supply a rule of decision generalizable to this case. *NTEU Chapter 53* involved a situation in which the union had removed a steward as a sanction for testifying before the FLRA. The FLRA's order to reinstate the steward under 7116(b)(1) is thus best explained as protecting the integrity of FLRA proceedings. This is entirely dissimilar from the situation here where the integrity of the FLRA is not at issue, and only traditional labor-management issues are at stake.

17. This was probably good advice. Poteat's report eventually led to a 14-day suspension of the nursing assistant. In a grievance proceed-

ing initiated by the employee, the grievance was sustained; the employee was awarded full back pay, full seniority and the incident was removed from his record. *See* Addendum B to Brief for Petitioner at 25. It thus appears that what Poteat reported was not an example of patient abuse. We do not wish to suggest that the truth or relevance of a report is a matter to be decided by the Union, or that Poteat was precluded from reporting what he might have legitimately felt to be patient abuse. However, it is undeniably true that Poteat was a new employee in the psychiatric ward, and might have benefitted from the experience of others in considering whether to report the event.

erwise. Arguably there could have been a coercive or disciplinary *effect,* but that effect seemingly is severely limited because there is no indication that the Union would take any action against Poteat in the future; nor is there any indication that the Union would have acted against Poteat if he had not been a Union steward. Since it is apparently undisputed that the Union had no interest in interfering with Poteat's filing of reports of patient abuse, and would take no actions to prevent him from doing so, it is difficult to see any substantial coercive or disciplinary effect on him or other members. Obviously, the FLRA cannot ignore these considerations on remand.

Turning to the second part of section 7116(b)(3), the record is devoid of evidence that the Union's *purpose* was to hinder or impede Poteat's work performance or productivity or the discharge of his duties. The Union never used the possibility of Poteat's removal as steward as leverage to get him not to file the report. On the contrary, the evidence clearly appears to point to Poteat's ineffectiveness as a steward as being the Union's sole concern, and it made no attempt to prevent Poteat from filing the report.

Finally, even assuming a violation of section 7116(b)(3) could be found, there are some serious questions regarding the remedy imposed by the FLRA—*i.e.,* there is an issue concerning the legitimacy of reinstatement of Poteat to his position as steward. It is undisputed that Poteat was an ineffective steward, even before the final incident that led to his removal. On this record, it would be the utmost in wishful thinking to suppose that, if reinstated, he would become an effective steward. The FLRA does not indicate at what point after reinstatement the Union would be justified in removing Poteat. If the removal of Poteat was tainted by his having reported the incident of patient abuse, when would this taint disappear? We are concerned that the FLRA's order, in effect, eliminates the Union's ability to remove an ineffective steward. The implications of this for labor-management relations are obvious and important.

### III. CONCLUSION

When asked at oral argument whether this was an "important case," counsel for the FLRA responded that it was merely an application of section 7116(b)(3) to the facts of the case. Perhaps this explains why the FLRA's opinion is utterly devoid of reasoned discussion and analysis, but it surely does not justify it. For the reasons outlined above, we think that this is a case that raises critically important questions concerning the proper role of the FLRA and the proper balance between labor and management in collective bargaining under the Statute. We remand so that the FLRA will treat this case as an important one and will provide us with a decision that we are capable of reviewing.