**Lindsey MEADER, et al., Plaintiffs,**

**v.**

**DISTRICT LODGE # 4, INDUSTRIAL UNION OF MARINE AND SHIP-BUILDING WORKERS OF AMERICA, International Union of Machinists and Aerospace Workers of America, AFL–CIO, Defendants.**

**Civ. No. 88–0212 P.**

United States District Court, D. Maine.

Feb. 28, 1992.

Aaron D. Krakow, Feinberg, Charnas & Schwartz, Boston, Mass., for plaintiffs.

McTeaghe, Higbee, Libner, MacAdam, Case & Watson, Topsham, Me., for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge, Sitting by Designation.

### I.

### BACKGROUND

The Amended Complaint, following a denial of a temporary restraining order and preliminary injunction, asserts that plaintiffs Lindsey Meader, Harry Williams, Robert Owens, Theodore Bamford, and Ainsley McPhee were disciplined by District Lodge No. 4 Industrial Union of Marine and Shipbuilding Workers of America, AFL–CIO ("IUMSWA").

Plaintiffs brought suit under Sections 101(a)(2) and (4) of the Labor–Management Reporting and Disclosure Act ("LMRDA"), popularly known as the Landrum–Griffin Act, 29 U.S.C. § 411(a)(2) and (4), and Section 609 of the LMRDA, 29 U.S.C. § 529. Plaintiffs Williams, Owens and Bamford further allege that defendant IUMSWA violated Section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), by failing to give adequate notice of their union trials.

A bench trial was held on August 5 and 6, 1991. The parties having briefed the issues fully, the Court is now ready to rule.

### II.

### FACTS

IUMSWA and its Local 6 have been the exclusive bargaining representative of approximately 6400 production and maintenance employees employed by Bath Iron Works for several years. In the early spring of 1988 the plaintiffs held the fol-

lowing union offices: (1) Lindsey Meader was the elected vice-president and a member of the Local 6 negotiating committee; (2) Harry Williams was an elected shop steward for the welding department and a member of the grievance committee; (3) Robert Owens was an elected shop steward in the pipe fitting department and member of the executive board; (4) Theodore Bamford was an elected shop steward and a member of the executive board; and (5) Ainslee McPhee was the recording secretary and president-elect of Local 6.

Due to a decline in union membership caused by a downturn in the ship building industry, the General Executive Board ("GEB") of IUMSWA decided that in order to survive it had to merge with another national union. Accordingly, in December 1987 a merger agreement was executed between IUMSWA and the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM"). The merger was to become effective upon ratification at a union convention.

Upon learning at a general membership meeting held in February 1988 of the proposed merger, members of Local 6 requested that IUMSWA hold a rank and file referendum on the merger. Under Article II of the IUMSWA Constitution, each IUMSWA local was entitled to one representative for every 200 members.[1] In October 1988 delegates to the IUMSWA national convention ratified the merger with IAM.

On or about June 13 and 14, 1988 plaintiffs Meader, Williams, Owens and Bamford circulated a petition among the members of Local 6, which reads:

> The undersigned employees of Bath Iron Works, due to severe decline in our Inter-national Union membership, the need for a strong union affiliation and the unilateral "Plans" by our International staff to force a merger with IAM for their own benefit without a membership vote and in order to preserve our identity as Local 6 hereby authorize the shipbuilders Local 6/UBC to act as our collective bargaining agent in dealing with our employer in regard to wages, hours and other conditions of employment. All previous authorizations made by us are hereby revoked.[2]

On June 14, 1988, while still vice-president of IUMSWA Local 6, plaintiff Lindsey Meader filed a representation petition with the National Labor Relations Board ("NLRB") on behalf of Local 6/United Brotherhood of Carpenters and Joiners of America.[3] The petition was accompanied by the signatures of those Local 6 members who had signed Joint Exh. 5. (Stipulated Facts ¶¶ 15 and 16.) The parties do not dispute that the filing of the NLRB petition was for the purpose of holding an NLRB election that could result in the replacement of the incumbent bargaining agent (IUMSWA) and the certification of a new bargaining agent. Nor is there a dispute that plaintiffs Meader, Williams, Owens and Bamford solicited and collected signatures on the NLRB representation petition on behalf of the Carpenters. Plaintiff McPhee, however, did not participate in the solicitation of signatures, although he opposed the merger.

In July 1988 Arthur Batson, President of IUMSWA, filed charges against Meader, Williams, Owens and Bamford. These four plaintiffs were charged with violating 1) their oath of office by soliciting signatures for a rival union, the Carpenters Union; 2)

---

**1.** Under this formula Local 6, with approximately 60% of the IUMSWA membership would have less than 30% of the delegate votes. The legality of the convention was challenged in federal court in Maryland to no avail. Plaintiffs do not challenge the proportionment of delegates. *See* Plaintiffs' Post-trial brief, p. 2 n. 1. *See also Grant v. Chicago Truck Drivers, Helpers, etc.,* 806 F.2d 114 (7th Cir.1986).

**2.** Joint Exh. 5. While plaintiffs drafted a petition requesting a rank and file vote on the merger, *see* Pl.Exh. 10, what triggers the present

controversy is Joint Exh. 5 and the filing of a Representation Petition with the National Labor Relations Board. Joint Exh. 4. No disciplinary action ensued because of the circulation of Exh. 10.

**3.** The record shows that Meader and Steve Perry, a representative of the Carpenters Union, had met and prepared a petition (Joint Exh. 5) to be circulated among Local 6 members authorizing the Carpenters Union to represent employees at Bath Iron Works.

Article I, Section 6 of the IUMSWA constitution and Article VIII, Section 3 of Local 6 bylaws by jeopardizing IUMSWA's right to serve as the joint exclusive bargaining representative together with Local 6 of the maintenance and production employees at Bath Iron Works; 3) Article IV, Section 19 of the IUMSWA constitution and Article VIII, Section 3 of Local 6 Bylaws, requiring IUMSWA to be a party to the Local 6 agreement, and 4) Article IV, Section 21 of the IUMSWA constitution prohibiting a local union from withdrawing from, seceding from, or terminating its affiliation with IUMSWA. Plaintiff Meader was additionally charged with filing the representation petition with the NLRB. The alleged facts underlying the charges against Meader, Williams, Owens and Bamford were the filing by the former of an NLRB representation petition and the soliciting of signatures to file an NLRB representation petition by the latter three.

On July 12, 1988, IUMSWA brought disciplinary charges against plaintiff McPhee alleging violations of 1) his oath of office; 2) Article I, Section 6 and Article IV, Sections 19 and 21 of the IUMSWA constitution, and 3) Article VIII, Section 3 of the local bylaws. The factual predicate for McPhee's charges alleged

> "specifically, shile [sic] serving as an officer of Local No. 6, by your presence and testimony during the Article XX hearing held on July 8, 1988 at the AFL–CIO Building in Washington, D.C., you identified yourself as a supporter of the U.B.C.'s petition for an N.L.R.B. representation election. You are violating the requirement that the National Union shall jointly be the exclusive representative of each member of this Union."

No charges were filed against rank and file members signing the petition for an NLRB election.[4]

---

4. At trial, Batson testified, without contradiction, that he initiated disciplinary action against plaintiffs because as union officers, unlike rank and file members, they had taken an oath of office, were receiving benefits from the Union in the form of payment for lost time, and had an obligation to be faithful to IUMSWA.

The trial of the charges brought against plaintiffs was held before GEB members Lonnie Vick and Joseph Grauman, appointed by Batson pursuant to Article V, Section 2(k) of the IUMSWA Constitution. Article V, Section 2(c) of the IUMSWA Constitution requires that written charges be received at least 14 days prior to the disciplinary hearing. There is no dispute, and the parties are in agreement, that Meader and McPhee received copies of the charges brought against them at least 14 days prior to their disciplinary proceedings. Williams, Owens, and Bamford contend that they did not receive written notice of the charges more than 14 working days prior to trial.

It is undisputed that written charges were sent by certified mail to the five plaintiffs at Local 6 office. By plaintiffs' own admission "by July 4, 1988, still 22 days prior to the commencement of the first of three trials IUMSWA was aware that the plaintiffs had knowledge of certified mail waiting for them at the union office and were making no effort to pick up their mail." Plaintiffs' Post-trial brief at 31. The charges, however, were not mailed to the plaintiffs' residence, but mailed to the union hall because Batson believed that there were delivery problems with rural post office boxes in Maine.[5]

An examination of the record discloses that Williams, Owens and Bamford had knowledge that IUMSWA had mailed them written charges for their activities in soliciting employees' signature. Williams testified that upon receiving a telephone call on June 27 in the shipyard from Lorin Morin, a Local 6 secretary, informing him that he had a certified letter from IUMSWA, he had "a strong clue because Mickey Meader had already been brought up on charges." Tr. 24. Because Williams failed to pick up the letter at the union office the first Thursday in July, secretary Carol Grose attached the certified letter

---

5. Owens testified that he knew there was mail for him at the union probably including his disciplinary charges, but that he had no intention of voluntarily picking up his charges and assisting the union in disciplining him. (Tr. 108–113.)

with a paper clip to Williams' pay check. Thereafter Williams picked up his check but left the certified letter. Tr. 265. The Court further finds that subsequently Grose hand-delivered the letter to Williams on July 13, 1988.

Williams' trial was held on July 26 and 27, 1988. Williams did not attend the proceedings, but on the first day of trial he sent a letter asserting that he had not received adequate notice of the trial and that he did not learn about the trial until July 20. After receiving evidence that Williams had solicited signatures on behalf of the Carpenters Union, the Trial Board upheld the charges. Williams was suspended from his elected position as shop steward and executive board member and prohibited from running for union office for three years. Williams appealed his suspension from union office. The appeal was heard by the GEB on October 14, 1988. Williams did not make a personal appearance. The appeal was denied on November 28, 1988.

Plaintiff Owens testified that he knew that the written charges were at the Local 6 office. On June 30 he received a telephone call from Carol Grose notifying him that he had a certified letter from IUM-SWA. Secretary Shorete also telephoned Owens concerning the certified letter. Owens responded that he was aware of it but that he was not going to pick it up. Morin also talked to Owens about the letter. Grose and Owens had several conversations at the union hall. Grose asked Owens to pick up the letter, but he did not do so. Finally, on July 13, 1988, in the union hall, at a Local 6 executive board meeting, Owens accepted the letter from Grose. The parties stipulated that the trial against Williams was held on or about July 27 and 28. Owens, like Williams, did not attend the proceedings. Evidence was adduced that Owens had solicited signatures on behalf of the Carpenters Union in connection with an NLRB election. The Trial Board sustained the charges, suspended Owens from his elected position as shop steward

and executive board member, and prohibited him from running for office for three years. Owens filed an appeal with the GEB, which was heard on October 13, 1988. Like Williams, Owens did not attend the appeal hearing. On November 29, 1988 Owens' appeal was denied.

The trial of Theodore Bamford was heard by the Trial Board on July 28, 1988. Like Owens and Williams, Bamford also testified that he received a telephone call at his home from Carol Grose that there was a registered letter for him at the Union hall.[6] Bamford conceded that he knew the letter contained the charges against him because Meader had already received charges for collecting signatures. Tr. 69. Following Grose's telephone call, he visited the union hall every day to take care of union business. When asked why he did not pick up the letter, Bamford replied: "All they did was tell me there was a letter they could have handed it to me." Tr. 70. While Bamford admitted walking into the secretary's office to pick up his paycheck, he did not ask for the letter from the union because "I didn't see that I have to ask for something, they told me it was there, they could have given it too [sic] me." The record shows, and the Court finds, that Bamford was reminded several times at the union hall to pick up the letter. He did not do so. On occasions he would try to avoid or dodge the secretaries. Tr. 269. Bamford did not attend the trial. The Trial Board sustained the charges and handed him a three-year suspension and a prohibition from running for office for three years. Bamford was removed as shop steward. He appealed and filed a statement in support thereof, but he did not attend the hearing on appeal. The appeal was denied.

There is no dispute that plaintiff Meader received a copy of the charges. Consequently, he raises no issue on the timeliness of the notice. Meader's trial was held on July 14, 15, 26 and 27 before the Trial Board. Meader appeared the first two

---

6. Carol Grose, a secretary for the Union, testified that she received and signed for Bamford's letter on June 30, 1988. Tr. 268.

days but did not attend the last two. The evidence presented against Meader showed that he had solicited signatures on behalf of the Carpenters and filed a representation petition with the NLRB. The Trial Board sustained the charges. Meader was removed from his positions of elected vice-president and member of the Local 6 negotiating committee and expelled from membership in Local 6. Additionally, Meader was prohibited from attending union meetings, running for union office, or voting on contract ratification. He was also removed from his position as a member of the State of Maine AFL–CIO Executive Board. Meader appealed his expulsion to the GEB. He did not attend the appeal hearing which was held on October 29. On November 29, 1988 the appeal was denied. On June 1, 1991, at Meader's petition, the GEB reduced the expulsion to a suspension, which ended in July, 1991.

Plaintiff McPhee's trial was held on September 12, 1989. Charges against him were filed in July 1988. By agreement with Batson on account of labor negotiations with Bath Iron Works for a new collective bargaining agreement, the Trial Board postponed his trial. After the NLRB election and following criticism from the membership of Batson's treatment of McPhee, the trial was scheduled and held on September 12, 1989.

On July 8, 1988, an AFL–CIO Article XX hearing between IUMSWA and the Carpenters Union was held in Washington, D.C.[7] McPhee, who was elected president of Local 6 on June 14, 1988, attended and testified at the Article XX hearing. McPhee traveled to Washington with Owens, who provided him with airplane tickets paid by the Carpenters Union. Steve Perry, representative of the Carpenters Union, asked McPhee to attend the Article XX proceeding. Upon arriving at the Washington airport, both McPhee and Owens were driven to the Carpenters' building. There, McPhee met with "some of the Carpenters," tr. 213, and with Kathy Krieger, counsel for the Carpenters. At the hearing he sat on the same side with counsel Kathy Krieger and other officials from the Carpenters Union. He signed an attendance sheet under the Carpenter's column. The decision issued by the Impartial Umpire lists McPhee's appearance on behalf of the Carpenters. McPhee alleges that he attended the hearing on behalf of Local 6 and IUMSWA. However, at the time of the hearing the NLRB petition filed by Local 6/UBC was pending, and it is reasonable to conclude that McPhee had knowledge of the NLRB petition. Had the Carpenters not withdrawn as a result of the Umpire's decision, Local 6, United Brotherhood of Carpenters, rather than Bath Shipbuilders Independent Union, would have been on the NLRB ballot. Consequently, the Court finds that McPhee attended the Article XX hearing in Washington, D.C., on behalf of the Carpenters. McPhee's testimony that he did not realize that he was signing under the Carpenters' column is unacceptable considering his long experience in union affairs. Furthermore, no explanation was given as to why he sat at the table on the side of the Carpenters at the hearing.

Based upon McPhee's conduct in connection with the Article XX hearing, the Trial Board upheld the charges, and suspended McPhee's membership for three years. He was further removed from his office as president of Local 6 and prohibited from

---

7. The AFL–CIO no-raiding procedure is an internal mechanism to discourage an organizational attack by an AFL–CIO affiliate on the established bargaining relationship of another affiliate. The no-raiding agreement is embodied in Article XX of the AFL–CIO Constitution. When invoked by the raided affiliate, in this case IUMSWA, the NLRB normally honors a timely request to suspend NLRB representation proceedings in "R" cases to permit operation of the no-raiding machinery. In this case the no-raiding provisions of Article XX worked when an AFL–CIO Impartial Umpire, Howard Lesnik, issued a decision holding that the Carpenters Union was in violation of Article XX of the AFL–CIO Constitution. Defendant's Exh. 2. Following the Impartial Umpire's ruling, the Carpenters withdrew the representation petition before the NLRB. The election was conducted with the name of the merged union and the Bath Shipbuilder Independent Union on the ballot. Defendant's Exh. 7. The tally of the ballots showed that 3,240 votes were cast for defendant and 2,307 for Petitioner Bath Shipbuilders Independent Union. Defendant's Exh. 7.

running for office during his suspension. McPhee appealed before the GEB and filed a statement in support of his appeal. He did not attend the hearing on appeal. Subsequently, the appeal was denied.

## DISCUSSION

Three main issues are presented for decision. First, whether the conduct of plaintiff Meader in collecting signatures together with Williams, Owens, and Bamford, and Meader's filing an NLRB petition on behalf of a rival union is protected conduct within the ambit of 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2).[8] Second, whether plaintiff McPhee's conduct in attending and testifying at the AFL–CIO Article XX hearing is protected by virtue of Section 101(a)(4), 29 U.S.C. 411(a)(4), guaranteeing union members the right to institute action in court or in proceedings before any administrative agency. Third, whether plaintiffs Harris, Owens, and Bamford received adequate notice of their disciplinary proceedings before the Trial Board.

1. Title I of the LMRDA, sometimes called the "Bill of Rights for Union Members," addresses Congress' concerns with "promoting union democracy, and protecting the rights of union members from arbitrary action by the union or its officers." *Finnegan v. Leu,* 456 U.S. 431, 442, 102 S.Ct. 1867, 1873, 72 L.Ed.2d 239 (1982). The Act ensures that union members have the right of free speech, protects the right to sue or otherwise participate in legal proceedings against the union, and establishes safeguards against improper disciplinary action. These rights, however, are subject to reasonable rules and regulations specified in the union's constitution. Consequently, the policies embodied in the LMRDA reflect an accommodation between democratization of unions and congressional deference toward a union's reasonable rules for self-governance.[9]

It is now settled that unlike *appointed* officials, *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), *elected* officials, like plaintiffs herein, come within the protection afforded by Section 102 of the LMRDA. *Sheetmetal Workers Int'l Ass'n v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989); *Maceira v. Pagan,* 649 F.2d 8 (1st Cir.1981). In exercising the right to engage in speech, assembly and expression, union officials as well as union members may not claim the protection of Title I when such conduct violates their responsibility toward the union as an institution or interferes with the union's performance of its legal or contractual obligation. Congress has recognized that unions may promulgate reasonable rules as to its members' responsibility to their union as an organization. 29 U.S.C. § 411(a)(2). Both the IUMSWA constitution and the bylaws of Local 6 provide that no local may secede from the union and that the national union must be a party to all collective bargaining agreements. This, the Court finds, is a reasonable rule aimed at maintaining the institutional integrity and existence of the defendant. *See National Education Association v. Dade*

---

8. Section 101(a)(2) provides:

   Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings his views upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings; Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to *his refraining from conduct that would interfere with its performance of its legal or contractual obligations.*" (Emphasis added)

9. For the legislative history of the Bill of Rights of Members of labor unions, *see* Note, *Union Officials and the Labor Bill of Rights,* 57 Fordham L.Rev. 601 (1989). Suits brought by union officers under the LMRDA Bill of Rights reflect the recurring problem of accommodating two conflicting policies: "the policy that the courts should abstain from interfering with the internal management of labor unions and the policy that the courts should protect fundamental rights of individual labor union members ..." *Sewell v. Grand Lodge of Int'l. Ass'n. of Machinists and Aerospace Workers,* 445 F.2d 545, 546 (5th Cir.1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972).

*County Classroom Teachers Ass'n.*, 407 F.Supp. 739 (S.D.Fla.1974), *aff'd* 527 F.2d 1388 (5th Cir.1976), *cert. denied* 429 U.S. 827, 97 S.Ct. 85, 50 L.Ed.2d 90 (1976).

Federal courts have held that unions are justified in expelling members who have helped organize a rival union.

> Under § 101(a)(2) of the LMRDA both the international and Local 1015 were justified in expelling Mayle for his dual union involvement. Section 101(a)(2), 29 U.S.C. § 411(a)(2) of the LMRDA permits the expulsion of any member who attempts to threaten the union as an institution. ... In addition, the National Labor Relations Board has held that expulsions are permissible where the actions of a union member interfere with the union's institutional integrity.

*Mayle v. Laborer's Local 1015*, 866 F.2d 144, 146–47 (6th Cir.1988). *See Ferguson v. International Ass'n. of Bridge, etc., Workers*, 854 F.2d 1169 (9th Cir.1988) (holding that statutorily protected speech did not immunize union members from discipline by the union for establishing a rival union, becoming its leaders, and promoting it); *Sawyers v. Grand Lodge Int'l. Ass'n. of Machinists*, 279 F.Supp. 747 (E.D.Mo. 1967) (ruling that advocating dual unionism by encouraging union members to abandon the national union and form an independent union threatens the enforcement of contractual obligations and therefore is not protected under Title I of LMRDA); *Price v. N.L.R.B.*, 373 F.2d 443 (9th Cir.1967), *cert. denied*, 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968) (holding that a union has the right to expel members who tried to destroy it by actively supporting a decertification petition). *See also* Tri–Marine Engineers Union, 188 NLRB No. 108 (1971); Tawas Tube Products, Inc., 59 LRRM 1330 (1965).

It is undisputed that plaintiffs Meader, Williams, Owens and Bamford circulated a petition and collected signatures among the members of Local 6 to authorize "Local 6, United Brotherhood of Carpenters" to represent Bath Iron Works' employees for the purpose of labor negotiations. The petition also requested revocation of previous authorizations. Immediately thereafter, plaintiff Meader, *while still vice-president of IUMSWA*, filed a representation petition with the NLRB on behalf of Shipbuilders Local 6/United Brotherhood of Carpenters and Joiners of America.[10] Plaintiff's conduct had the intended effect of not only replacing IUMSWA as the exclusive bargaining representative of Bath Iron employees, but also of interfering with the contractual and legal obligations of said union vis-a-vis the employer, by interfering with IUMSWA's performance of its duty to bargain collectively with Bath Iron on behalf of its employees. Furthermore, plaintiff's conduct violated IUMSWA's constitution that no local may secede from the union and that the national union must be a party to all collective bargaining agreements.

The proviso to 29 U.S.C.A. § 411(a)(2) subordinates union members' rights to reasonable union rules regarding a member's responsibility to the union and to refrain from conduct that would interfere with the union's legal or contractual obligations. A labor organization has the right to expect that elected officers or agents do not sabotage or subvert its policies in the name of a "supposed loyalty to union members" nor engage in activities diametrically opposed to the very existence of the union. *Maceira v. Pagan*, 649 F.2d 8 (1st Cir.1981). Plaintiffs violated their responsibilities and oath toward IUMSWA and were properly and lawfully disciplined.

Plaintiffs' conduct constituted an attack on IUMSWA's survival as the bargaining agent for the maintenance and production employees at Bath Iron Works. Its very existence as the exclusive bargaining agent for BIW's employees was placed in jeopardy. Consequently, in so doing plaintiffs Meader, Williams, Owens, and Bamford lost the protection afforded by Section 101(a)(2) of the LMRDA. It then follows that in disciplining these plaintiffs, IUMSWA did not violate Title I of the LMRDA.

10. *See* Joint Exh. 5 (Stipulated Facts, ¶ 15 and 16.)

*See Davis v. Ampthill Rayon Workers,* 446 F.Supp. 681 (E.D.Va.1978).

2. Plaintiff McPhee claims that the three-year suspension from membership and removal from office as president of Local 6 because of his presence and testimony at the Article XX hearing held at the AFL–CIO headquarters in Washington, D.C., contravened Section 101(a)(4) of the LMRDA, 29 U.S.C. 411(a)(4), which states:

(4) *Protection of the right to sue*

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency ... or the right of any member of a labor organization to appear as a witness in any judicial, administrative or legislative proceeding, or to petition any legislature or to communicate with any legislator ...

Plaintiff McPhee, the undisputed record shows, was disciplined for attending and testifying at the AFL–CIO Article XX hearing. McPhee asserts that it is a violation of Section 101(a)(4) of the LMRDA to limit the right of a union member to "appear as a witness to any judicial, administrative or legislative proceeding." Contrary to McPhee's testimony, the Court finds that he attended the hearing and testified on behalf of the Carpenters. *See* pp. 99–100 *ante.*

■■■ While a union may not discipline members for filing unfair labor practice charges against the union with the National Labor Relations Board, or for bringing suit in court, *N.L.R.B. v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), a union has the right to discipline members for filing a representation with the NLRB on behalf of a rival union.

Section 8(b)(1)(A)[11] of the Labor Management Relations Act, contains a proviso stating

[t]hat this paragraph shall not impair the rights of a labor organization to prescribe its own rules with respect to acqui-

sition or retention of membership therein.

This proviso, like the proviso in Section 101(a)(2) of the LMRDA, was intended to balance the rights of union members with the rights of unions to establish reasonable rules in the governance of their internal affairs. Relevant case law cogently explains the difference between the protection from union discipline afforded employees who file unfair labor practice charges before the NLRB or suit in court, and the protection for employees who file a representation petition before the NLRB.

The legislative history of the proviso shows that it was designed to make it clear that in passing section 8(b)(1)(A) Congress was not trying to interfere with the internal affairs of unions, but was trying to outlaw coercive and restraining acts of unions attempting to organize unorganized employees.

*Price v. N.L.R.B.,* 373 F.2d 443, 446 (9th Cir.1967) (citations omitted), *cert. denied,* 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968). Price had filed a decertification petition with the NLRB. The union disciplined him for violating the clause in its constitution prohibiting members from advocating or attempting to bring about the withdrawal from the international union of any local union or any member or group of members. In sustaining the union's right to suspend Price, the Court ruled:

Price did not accuse the union of violating any provision of law. He sought to attack the union's position as bargaining agent, which is, as the Board says, in a very real sense an attack on the very existence of the union. We think that, at the least, the proviso was intended to permit the union to suspend or expel a member who takes such a position. Otherwise, during the pre-election campaign, the member could campaign against the union while remaining a member and therefore privy to the union's strategy and tactics. We can see no policy reason

---

**11.** Section 8(b)(1)(A) of the Labor–Management Relations Act, 29 U.S.C. § 158(b)(1)(A), makes it an unfair labor practice for a union to coerce or restrain employees in the exercise of their Section 7 rights.

for requiring the union to retain a member who takes such a position.

*Id.* at 447.

Plaintiff McPhee argues that his participation in the Article XX hearing is a protected activity within Section 101(a)(4) of the LMRDA. The Court finds otherwise. It defies logic to conclude that a union member may be subjected to discipline for soliciting signatures and filing a petition with the NLRB (which is an "administrative agency") on behalf of a rival union, but is immune from discipline for conduct on behalf of a rival union before an AFL–CIO Article XX proceeding. The Impartial Umpire ruled that the Carpenters Union had violated the no-raiding agreement (Article XX) of the AFL–CIO. Had the AFL–CIO Impartial Umpire ruled otherwise, the Carpenters Union would not have withdrawn from the NLRB representation proceedings, it would have participated in the NLRB election with all its resources, and it would certainly have posed a greater threat to IUMSWA than the Independent Union. *See* note 7, *ante.* Consequently, McPhee's conduct—*who at the time was the president of Local 6 of IUMSWA*—in participating in the Article XX hearing on behalf of the Carpenters Union in a peripheral representation proceeding, is conduct that may only be categorized as inimical and deleterious to IUMSWA representational, bargaining, and contractual rights in the Bath Iron Works bargaining unit. That McPhee was the union's president heightens rather diminishes the gravity of his conduct. The Court, therefore, rejects McPhee's claim that his three-year suspension from membership and removal from office as president was unreasonable. *See International Bro. of B.,I.,S.,F., & H. v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971). Consequently, assuming that the Article XX proceeding qualifies as a proceeding before an "administrative agency," or as an "administrative proceeding"—a matter that this Court need not decide—it does not, as in the case of representation proceedings before the NLRB, immunize a union member, much less an elected official from disciplinary action when his participation therein is on behalf of a rival union.

3. Plaintiffs Harris, Owens, and Bamford claim that they did not receive adequate notice of their disciplinary proceedings before the Trial Board in violation of Section 101(a)(5) of the LMRDA, which provides:

No member of any labor organization may be fined, suspended, or otherwise disciplined except for non-payment of dues by such organization or by any officer thereof, unless such member has been (a) served with written specific charges; (b) given a reasonable time to prepare a defense; (c) afforded a full and fair hearing.

The IUMSWA constitution provides that written notice of charges brought against members shall be provided not less than fourteen working days prior to trial. Plaintiffs specifically assert that because they did not receive written notice of their charges within a reasonable date of their trial board hearings, both the trials and the subsequent discipline ran afoul of the procedural due process rights secured to union members under Section 101(a)(5). The purpose of the procedural due process rights in Section 101(a)(5) is to guarantee to union members the right to notice and an opportunity to be heard before any disciplinary action is taken against them. *Howard v. United Ass'n of Journeymen, etc.,* 560 F.2d 17 (1st Cir.1977).

The question whether a union member has been given timely or adequate notice is fact-specific. The basic purpose of Section 101(a)(5) is to assure that an accused member "becomes fully informed as to the nature and extent of the charges a reasonable time prior to the hearing ... even though the original notice was defective or lacking." *Magelssen v. Local Union No. 518,* 233 F.Supp. 459, 461 (W.D.Mo.1964). The facts show that IUMSWA reasonably tried to serve plaintiffs by certified letter with copy of the charges in timely fashion. The Court is convinced that plaintiffs were intentionally avoiding the receipt of the letters. They knew that the certified letters contained the charges of soliciting signatures on behalf of the Carpenters. This solicitation was not contested at trial. It is an admitted fact that plaintiffs solicited authorization cards on behalf of the Car-

penters Union while they were IUMSWA Local 6's elected officers.

Plaintiffs' position was exemplified by Owens' testimony that he had no intention of voluntarily picking up his charges and assisting the union in disciplining him. Tr. 108–113. Bamford refused to pick up his letter and adamantly avoided the union's secretary that kept reminding him of the certified letter addressed to him. Williams knew about the contents of the letter. He had "a strong clue because Mickey Meader had already been brought up on charges." Tr. 24. Owens had informed Shorete that he was not going to pick up the certified letter. All three plaintiffs had their letters made available to them prior to the 14–day advanced notice. The record strongly suggests a concerted strategy by these plaintiffs to play cat and mouse with the notices. While the evidence shows that Williams and Owens did receive the charges from Grose by hand, and that Bamford did not actually receive it, the Court finds that these plaintiffs did engage in a concerted effort to follow a pattern of avoiding personal service within the 14–day period prior to the hearings. For one, they all failed to show up at the trial. For another, they all took an appeal to the GEB and they all failed to appear at the GEB hearing.[12]

Because plaintiffs have failed to show that IUMSWA deprived them of a fair hearing or impaired their ability to prepare and present a defense, their claim on untimely notice must fail. Similarly, plaintiffs have failed to show that the trial board or the executive committee was biased.

WHEREFORE, the complaint is hereby ordered dismissed. The Clerk shall enter judgment accordingly. Costs to defendant.

IT IS SO ORDERED.

---

**12.** The Court notes that plaintiff Meader, who does not raise the claim of lack of notice, appeared the first two days at the Trial Board hearing, but did not attend the last two days, setting the stage, it appears, for the others to follow. Because the Court is ruling on the merits, it need not reach the issue of plaintiffs' failure to exhaust internal union remedies. *But see Gesink v. Machinists,* 831 F.2d 214 (10th Cir.1987).