**LABORERS' DISTRICT COUNCIL OF WASHINGTON, D.C. AND VICINITY, et al., Plaintiffs,**

**v.**

**LABORERS' INTERNATIONAL UNION, Defendant.**

**No. CIV.A. 03–0959(JR).**

United States District Court, District of Columbia.

March 2, 2004.

Thomas J. Hart, Slevin & Hart, P.C., Washington, DC, Charles R. Both, Yablonski Both & Edelman, Washington, DC, for Plaintiffs.

Jeffrey A. Bartos, Guerrieri, Edmond & Clayton, Washington, DC, for Defendant.

## MEMORANDUM

ROBERTSON, District Judge.

Plaintiffs in this case are Laborers' District Council of Washington, D.C. and Vicinity ("WDC"), Building Construction Laborers' Local Union No. 74 ("Local 74"), Road, Highway and Heavy Construction Laborers Union No. 456 ("Local 456"), and seven officers of WDC who are also members of Locals 74 or 456. They complain that the decision of the defendant, Laborers' International Union of North America ("LIUNA"), to merge the WDC with the Laborers' District Council of Baltimore ("BDC") and to revoke the charters of Locals 74 and 456(1) was in bad faith; (2) violated union members' freedom of speech and association; (3) was an unlawful imposition of discipline; and (4) constituted an unlawful trusteeship. On May 9, 2003, after hearing plaintiffs' motion for prelimi-

nary injunction, I declined to grant affirmative relief but ordered the defendant to maintain the status quo pending trial or other disposition on the merits. Now before the Court is defendant's motion for summary judgment, which, for the reasons stated below, must be **granted**.

### Background

LIUNA is an international labor organization that has local union and district council affiliates throughout the United States and Canada. LIUNA's constitution provides for two types of affiliated subordinate organizations: (1) local unions, which are primarily responsible for enforcing collective bargaining agreements, *see* Unif. Local Union Constitution of the LIUNA, art. 2, § 2; and (2) district councils, which are primarily responsible for negotiating, bargaining for, and entering into collective bargaining agreements on behalf of affiliated local unions, *see* Unif. Dist. Council Constitution of the LIUNA, art. 2, § 2.

At LIUNA's 2001 international convention, General President Terrence O'Sullivan proposed, and the delegates adopted, a resolution calling for each local union to increase its market share in every sector in which it organizes by twenty percent within five years. Following the resolution's adoption, LIUNA developed a reorganization plan, which proposed to merge WDC and BDC (to form the Baltimore/Washington Laborers' District Council), and to revoke the charters of Locals 74 and 456 (and merge the locals, to form a newly-created, provisional local union, Local 657).

On January 15, 2003, O'Sullivan issued a "Notice of Hearing" to Locals 74 and 456, WDC and BDC, inviting all members and officers to attend a hearing before a panel of LIUNA's General Executive Board ("GEB") to consider the proposed reorganization that would affect those entities:

[A] Hearing will be held before a Hearings Panel of the LIUNA General Executive Board to consider a Reorganization Proposal submitted by Vice President and Regional Manager Dennis L. Martire. The Proposal includes two aspects:

1. To merge the Laborers' District Council of Washington, D.C. and Vicinity into the Baltimore, Maryland Laborers' District Council, to be renamed the Baltimore/Washington Laborers' District Council; and

2. To merge Local Unions 74 and 456 into a new Local Union that will include the jurisdictions of both Local Unions.

The purpose of the proposed reorganization is to provide the most efficient and productive structure possible to increase our share of the work in this single metropolitan area. It is anticipated that the reorganization will result in better services, more jobs for our members, and greater resources for increasing our market share.[1]

---

1. The notice also set forth the rules of procedure for the hearing, and a summary of the reorganization plan and of the reasons for the merger and charter revocations, concluding: that the Reorganization Plan, if accepted, will result in stronger and more effective representation for our members throughout the metropolitan area[;] ... will substantially improve our ability to increase market share[; will permit s]avings from the consolidations [which can then] be directed to organizing, target funds and/or other activities designed and proven to increase market share and bargaining power[;] ... [will r]educe[] administrative costs, [resulting in] greater efficiency ... reduce[] working dues structure; ... [and make available m]ore resources and consolidated staff [that] can lead to more training and work opportunities for our members. Letter from O'Sullivan, to Locals 74 and 456, WDC and BDC, dated January 15, 2003, at 4–5.

Letter from O'Sullivan, to Locals 74 and 456, WDC and BDC, dated January 15, 2003, at 1.

The hearing was held before a GEB panel on January 28, 2003. Testimony was taken in support of and against the proposed merger. The panel held the record open for submissions until February 7, 2003. By letter dated April 29, 2003, the plaintiffs were provided with a copy of the hearing panel's report, which recommended that the WDC be merged with the BDC, and that the charters of Locals 74 and 456 be revoked and the locals merged into a new provisional local union. The letter also informed the plaintiffs that the entire 15–member GEB had voted on April 12, 2003, to adopt the findings and recommendations of the panel. The hearing panel's report included these conclusions:

- "that the cities of Baltimore, Maryland and Washington, D.C. function as a single metropolitan area ... [and m]àny signatory building and heavy highway contractors are interchangeable in either city, from larger outfits ... to smaller masonry contractors";
- "the International Union and the Mid–Atlantic Region['s] devot[ion of] substantial resources to assist the D.C. District Council and its Local Unions to increase organizing efforts [have met] with disappointing results";
- "the Washington, D.C. area's market share continues to lag substantially behind that of other major urban areas in the Mid–Atlantic Region [and, w]hile exact market share figures are in dispute, ... the Laborers' experience in the D.C. area has been a long and ongoing struggle merely to stay afloat with little forward movement. Even assuming that the percentage may have improved somewhat in recent months, ... overall share in this area remains marginal at best";

- "the D.C. District Council has been unable effectively to fulfill its Constitutional duties with respect to collective bargaining, policing its jurisdiction, and enforcing its hiring hall procedures[,] fail[ing] to renegotiate agreements with contractors, resulting in laborers working under expired and outdated agreements, and, in some cases, in contractors making fringe benefit contributions in contravention of federal labor law";
- "[t]he territorial jurisdictions of the two Local Unions are identical[, although they differ] with respect to the work jurisdictions granted to them by their respective charters [and] in recent years ... many members of Local Union 456 have been employed on Local Union 74 jobs";
- "[c]onsolidation of the [WDC and BDC] will necessarily eliminate the substantial and duplicate costs needed to support two separate entities ... [and, i]n addition to the operational efficiencies and economies which would result from the merger, it is estimated that a significant one-time transfer of assets of over $800,000 would result from closure of the [WDC office; t]hese funds could then be more productively directed to support organizing, training and other initiatives which must be implemented if an increase in market share is to be achieved";
- "the proposed merger of Local Unions 74 and 456 ... would free up more than one-half million dollars in fixed assets and provide approximately $200,000 in increased funds available each year for use in organizing, policing existing contracts, servicing our members, and increasing LIUNA's market share in a more efficient and effective Local Union";
- "[t]he Reorganization Plan ... is also likely to result in greater administrative

efficiency at both the District Council and Local Union level [with] members in the area [being] better served by a single, focused decision-making authority in a single location than by two separate authorities with competing and/or overlapping interests in separate locations." Findings and Recommendations of the Hearings Panel, at 2–4. The day after this letter was sent, April 30, 2003, plaintiffs sued in this court for a preliminary and permanent injunction to block the merger of the district councils and revocation of the locals' charters.

### Analysis

Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in the nonmoving party's favor, and accept the uncontroverted evidence of the nonmoving party as true. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, in proffering evidence to defeat a motion for summary judgment, the nonmoving party cannot simply rely on conclusory statements or allegations. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999). Rather, the nonmoving party must come forward with specific facts that, when viewed in the context of the record as a whole, could reasonably lead a rational trier of fact to find for the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

#### 1. *Bad Faith*

■ It is well-established that "[a]n interpretation of a union constitution rendered by officials of a labor organization is entitled to considerable deference by a reviewing court and should not be overruled unless the court finds that the interpretation was unreasonable or made in bad faith." *Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C.Cir.1984); *see also, e.g., Local No. 48, United Bhd. of Carpenters and Joiners of Am. v. United Bhd. of Carpenters and Joiners of Am.*, 920 F.2d 1047, 1051 (1st Cir.1990). In determining whether union officials' construction of the governing constitution is reasonable, factors to be considered include

unanimity, timing, and transparency of decision-making processes, the rationale underlying the interpretation, subsequent approval by higher legislative or decision-making bodies within the union hierarchy, the availability of democratic processes to bring about an appropriate amendment to the constitution, past practices within the union, the likelihood that the interpretation at issue would lead to a breach of trust, support for the interpretation in case law, and avoidance of conflict between different provisions of the constitution.

*Noble v. Sombrotto*, 260 F.Supp.2d 132, 136 (D.D.C.2003) (citing *Monzillo*, 735 F.2d at 1458 (directing district court to consider timing and secrecy of Board interpretation of constitution, and subsequent convention resolution ratifying union's interpretation)). The critical question in evaluating the reasonableness of a union's decision is "whether there was arguable authority for the officer's act from the officer's viewpoint at the time." *Stelling v. Int'l Bhd. of Elec. Workers, Local Union No. 1547*, 587 F.2d 1379, 1389 n. 10 (9th Cir.1978) (internal quotation marks and citation omitted). "If this query is answered in the affirmative, further judicial scrutiny of the decision, absent bad faith, is foreclosed." *Local 48*, 920 F.2d at 1052.

"[B]ad faith in ordering a merger can be found on evidence that union officials acted contrary to the international's best interests, out of self-interest, or in an unconscionable or outrageous way." *Id.* at 1055.

 Plaintiffs' assertion of bad faith complains of inadequate notice of the reasons for the reorganization, rendering them "unable to adequately respond at the hearing," Pls.' Opp'n, at 30; the union's reliance on "untrue, inaccurate or unsupported" facts, *id.;* and Martire's use of the reorganization plan as "pretext" to enable him "to punish the WDC and its constituent locals [and to] enable[ ] Martire to avoid explaining his failure to successfully organize new contractors in the Metropolitan Washington region." *Id.*

The first of those assertions is belied by the record. Plaintiffs were provided notice of the January 28, 2003 hearing by letter dated January 15, 2003, and told specifically that the hearing topic was to be the reorganization plan submitted by Martire. The notice also informed the plaintiffs that the plan included the proposed merger of the WDC and BDC into the Baltimore/Washington Laborers' District Council, and merger of Locals 74 and 456 into a new local union, and explained that the purpose of the proposed reorganization was "to provide the most efficient and productive structure possible to increase [the market] share of the work" in the Washington/Baltimore metropolitan area. Plaintiffs were invited to attend the hearing, and to present testimony in support of or against the proposal (the record shows that at least one plaintiff, Herman Sykes, took advantage of this opportunity and testified at the hearing). At the hearing itself, extensive testimony was provided which revealed the asserted reasons for the reorganization, and the hearing record was left open for ten days after the hearing so that plaintiffs had the opportunity to supplement the record as they deemed appropriate.

Plaintiffs' second assertion, that there were flaws in the data and statistics on which the hearing panel's findings were made, is beside the point. The question of whether the reorganization plan was "wise, or well-advised, or ultimately correct" is not before this Court. *Local 48,* 920 F.2d at 1053. For the same reason, plaintiffs' efforts to undermine the conclusions of the hearing panel by, *inter alia,* challenging the methodology used to determine market share statistics for the Washington/Baltimore regions, are unavailing. "[T]he general reasonableness of the merger decision is not a matter for judicial review[; r]ather, the plaintiffs must show that the order was unreasonable in a special sense, namely, that the order totally lacked any plausible foundation and was, therefore, unconscionable or outrageous." *Id.* at 1054. Plaintiffs have neither adduced evidence nor pointed to anything of record indicating that the GEB's reorganization decision was so unreasonable that it totally lacked any plausible foundation. The record indeed shows that the extensive findings of the hearing panel in support of the reorganization are consistent with the goal of the 2001 Convention to have local unions increase their market shares in every organizing sector. "Once the International has given a reasoned and founded explanation for the merger, judicial inquiry into the decision's reasonableness as a telltale for bad faith must end." *Id.* The Court finds that the proffered reason for the adoption of the reorganization plan was reasonable.

Finally, the Court is unpersuaded by plaintiffs' assertion that the reorganization was a pretext to enable Martire to avoid explaining his failure to successfully organize new contractors in the Metropolitan Washington region, or that it resulted from Martire's desire to punish the WDC

and its constituent locals. This is speculative, conclusory argument, and it is completely unsupported. There is no evidence, for example, that Martire received or will receive "the type of personal benefit required for a finding of bad faith, such as a monetary inducement or exchange." *Mason Tenders Local Union 59 v. Laborers' Int'l Union of N. Am.*, 924 F.Supp. 528, 548 (S.D.N.Y.1996) (citing *Local 48*, 920 F.2d at 1055 (stating that personal financial gain is the type of self-interest establishing that a union official acted in "bad faith")). Even if plaintiffs had made a showing that Martire proposed the reorganization plan out of animus toward them, such a showing was cured by the hearing panel's extensive findings in support of its recommendation to adopt the plan, and the GEB's unanimous fifteen-member vote to adopt this recommendation.

The Court finds no evidence of bad faith. It is conceded that the delegates of the 2001 convention adopted General President O'Sullivan's proposed resolution "calling for each local union to increase its market share in every sector in which it organizes by 20% within the next five years." Pls.' Opp'n, at 4. Moreover, LIUNA's interpretation that its constitution vests the GEB with the authority to merge district councils and revoke local union charters is facially reasonable and deserving of deference. According to the LIUNA Constitution, "[t]he supreme authority of the International Union ... reside[s] in the members in Convention assembled through representatives of their own choosing, by election of delegates." LIUNA Int'l Union Constitution, art. I, § 2. Between Conventions, this authority resides in the General Executive Board. *Id.*

The LIUNA Constitution vests the GEB with the authority to, "[u]pon notice and after hearing ... revoke, consolidate or amalgamate the charters of Local Unions, District Councils, or other subordinate bodies and to define or revise their craft or territorial jurisdiction." *Id.*, art. VIII, § 2(g).[2]

2. *Freedom of speech and association*

■ Plaintiffs next claim that the reorganization plan violated rights of freedom of speech and association guaranteed to them by § 101 of the Labor–Management Reporting and Disclosure Act of 1959 (codified as amended at 29 U.S.C. § 401 *et seq.*) ("LMRDA"), because members of Locals 74 and 456 were not allowed to vote on the reorganization. Section 101(a)(2) of the LMRDA guarantees every member of a labor organization the "right to meet and assemble freely with other members; and to express any views, arguments, or opinions ...." 29 U.S.C. § 411(a)(2). Moreover, section 101(a)(1) provides that

[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

*Id.* § 411(a)(1). However, this section " 'is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote.' " *Stelling*, 587 F.2d at

2. Contrary to plaintiffs' assertions, art. IX, § 5 of the LIUNA Constitution is inapplicable here because this section applies "[w]hen any subordinate body ... *fails, neglects or refuses to conform to or comply with a decision or* order of the [GEB] or of the General President." Article II, § 3(f) of the Uniform Local Union Constitution is also inapplicable, as it applies to the voluntary surrender of a local union charter.

1384 (quoting *Calhoon v. Harvey,* 379 U.S. 134, 139, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964)). Plaintiffs do not contend that they had a right under the LIUNA constitution to vote on the reorganization plan, and indeed it appears quite clear that LIUNA has the power to revoke the charters of local unions without a vote by the members of the affected local unions. *See* LIUNA Int'l Union Constitution, art. I, § 2 & art. VIII, § 2(g), *supra.*

What plaintiffs do claim is that LIUNA violated § 101 by not allowing them to vote on the reorganization plan when *members of other similar local unions and district councils* have been permitted to vote. "[Section] 101(a)(1) provides that where members elsewhere have been given the right to vote on an issue, the union may not unreasonably discriminate against members in the exercise of that vote." *Johnson v. Kay,* 742 F.Supp. 822, 827 (S.D.N.Y.1990). The problem with this assertion is that plaintiffs have neither adduced evidence nor pointed to anything in the record that proves the major premise from which it argues. Instead, what the record reveals is that the constitutional requirements of notice and hearing were satisfied in this case, and that the consent of the plaintiffs was not required.

### 3. *Unlawful imposition of discipline*

■ Plaintiffs next complain that the reorganization plan was an unlawful imposition of discipline taken in bad faith, in violation of the LMRDA § 609. This section provides that

> [i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter . . . .

29 U.S.C. § 529. " 'Discipline' typically involves official union conduct that has the purpose and effect of punishing a member." *Galke v. Duffy,* 645 F.2d 118, 120 (2d Cir.1981). Section 609 protects union members, not union officers: "It is readily apparent, both from the language of [§ 609] and from the legislative history of Title I, that it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect." *Finnegan v. Leu,* 456 U.S. 431, 436–37, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). Plaintiffs (all union officers) have not responded to the defendant's argument that § 609 does not protect union officers. This claim will be treated as abandoned.

### 4. *Unlawful trusteeship*

■ Plaintiffs assert, finally, that the reorganization plan resulted in a *"de facto"* trusteeship over the WDC. " 'Trusteeship' means any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws." 29 U.S.C. § 402(h). Plaintiffs argue that LIUNA has suspended the autonomy of the former WDC and "effectively placed [its affairs] in the hands of LIUNA Regional Vice President Dennis Martire and his agents." Pls.' Opp'n, at 40.

The LMRDA and its regulations permit the appointment of officers of a newly merged labor organization until a regular election can be scheduled, *see* 29 C.F.R. § 452.14; *Mason Tenders,* 924 F.Supp. at 547. Such an appointment does not amount to continuing supervision over the subordinate body such as to create a trusteeship. *See Mason Tenders,* 924 F.Supp. at 547. Nor have plaintiffs adduced facts or pointed to record evidence that would establish their claim that the newly formed Baltimore/Washington Laborers' District

Council is under LIUNA's supervision or control.

No trusteeship has been established. The Court need not examine whether LIUNA complied with the constitutional and statutory procedures necessary to impose a valid trusteeship.

An appropriate order accompanies this memorandum.

### *ORDER*

Having considered the defendant's motion for summary judgment and the opposition thereto, it is

**ORDERED** that the motion for summary judgment [# 13] is **granted**. It is

**FURTHER ORDERED** that the stay [# 10] previously ordered is **vacated**. And it is

**FURTHER ORDERED** that this case is **dismissed**.